IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ADERYN V. by and through her father,<br>Stephen W., and STEPHEN W. in his own capacity,:<br>of King of Prussia, PA 19406 : | |
| : | Civil Action |
|        Plaintiffs          : | |
| v.                   : | No. |
|                    : | |
| WEST CHESTER AREA SCHOOL DISTRICT  : | |
| 782 Springdale Drive              : | |
| Exton, PA 19341                : | |
|                    : | |
|        Defendant        : | |

## **COMPLAINT**

### I.   **Introduction**

1.     Plaintiff Aderyn V. ("Aderyn") is an eight-year-old child with Oppositional Defiance Disorder ("ODD"), Conduct Disorder, and Attention Deficit Hyperactivity Disorder ("ADHD") who the Defendant West Chester Area School District ("District" or "School District") failed to timely evaluate for special education services during kindergarten and first grade. When the School District finally evaluated Aderyn, her teachers had been reporting observations of "self-injurious behaviors, licking the desk, and eating substances such as grass," as well as a history of needs related to "academic performance, attention/focus, impulsivity, managing emotions, and compliance with directives." Hearing Officer Final Decision and Order, 1/5/23, 8-9 ("Decision").

2.     On January 13, 2022, Aderyn's mother filed an administrative Special Education Due Process Complaint on Aderyn's behalf seeking relief under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, which led to a due process hearing held on March 16, 2022 and

1

April 4, 2022. Her mother then lost custody of Aderyn. Aderyn's father, Plaintiff Stephen W. ("Parent") was awarded full legal and physical custody. He filed his own complaint on behalf of Aderyn on August 26, 2022, continuing the action. On November 15, 2022, rather than recall the witnesses from the March and April hearings, the parties stipulated to the admission of the transcripts and exhibits from those hearings, which the Parent supplemented with further testimony and documentary evidence on November 15, 2022.

3.      On January 5, 2023, the Special Education Due Process Hearing Officer ("Hearing Officer") issued an opinion granting relief in part to Aderyn and the Parent (collectively, "Plaintiffs" or "Family") and in part to the School District.

4.      The Hearing Officer correctly concluded that the Family's claims were not barred by the statute of limitations and that the Family was entitled to seek relief for any alleged violations of IDEA and Section 504 from the beginning of Aderyn's education in the District (the 2019-2020 school year) through the filing of the Due Process Complaint (January 13, 2022). Decision, 22, 27.

5.      The Family sought compensatory education from the middle of Aderyn's kindergarten year (2019-2020) through May of her first grade year (2020-2021), as Aderyn's mother moved her out of the School District and began homeschooling her on May 10, 2021.

6.      However, the Hearing Officer erroneously found that the School District timely evaluated Aderyn and thus did not violate its "Child Find" duty under the IDEA or Section 504 when it evaluated Aderyn in January of 2021 (her first grade year). Remarkably, the Hearing Officer found that the School District did not have reason to suspect that Aderyn had a disability until her mother advised the School District in late November of 2020 that Aderyn was privately diagnosed with ODD, Conduct Disorder, and ADHD and requested a special education evaluation.

7.      The Hearing Officer found that the Individualized Education Plan ("IEP") the

2

School District created on March 11, 2021 contained only four goals, two of which were flawed thus denying Aderyn a Free Appropriate Public Education ("FAPE"). Decision, 26, 27. The Hearing Officer awarded the Family "thirty minutes per day of compensatory education for each day that school was in session from March 28, 2021 through May 10, 2021 in order to remedy the denial of FAPE." *Id.* at 28.

8. The Hearing Officer's statute of limitations determination and the award of compensatory education confers onto the Family "prevailing party" status, thereby entitling the Family to attorney's fees and costs for their time spent advocating on behalf of Aderyn. The Family will move for fees in this Court at the appropriate time.

9. The Family now appeals the Hearing Officer's Decision to this Court by bringing this action against Defendant School District pursuant to IDEA, Section 504, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101; the federal and state implementing regulations of the foregoing statutes; and Chapters 14 and 15 of the Pennsylvania Code. The Family asks that this Court affirm the Hearing Officer's statute of limitations finding and her award of compensatory education, but otherwise reverse the Decision, and: (1) determine that the School District failed to timely and sufficiently identify Aderyn's complete educational needs (a "Child Find" violation) during her kindergarten year (2019-2020); (2) determine that the School District failed to provide Aderyn with a FAPE even after identifying her in February of 2021; (3) award compensatory education from the middle of kindergarten until May 10, 2021; (4) award reasonable attorney's fees and costs; and (5) award any other relief this Court deems just.

## II.   Parties

10. Aderyn was born in 2014 and is an eligible student with disabilities under IDEA. She is also a Protected Handicapped Student under Section 504 and a qualified individual with a

3

disability under the ADA. She resided in West Chester, Pennsylvania at all relevant times in this matter. While she now resides with her father (Plaintiff Stephen W.) in King of Prussia, Pennsylvania, at all relevant times to this action, Aderyn resided within the geographical boundaries of the Defendant School District.

11.     Stephen W. is Aderyn's parent and natural guardian.

12.     The West Chester Area School District is located at 782 Springdale Road Exton, Pennsylvania 19312. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries. Such services include those mandated under IDEA; Section 504; 22 Pa. Code Chapters 14 and 15; and 24 P.S. Chapter 13.

## III.    Jurisdiction and Venue

13.     This Court has original jurisdiction over this appeal under 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

14.     Plaintiffs have exhausted administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a special education due process hearing. 20 U.S.C. § 1415(i)(2)(A).

15.     Plaintiffs' claims and remedies are authorized by 20 U.S.C. § 1415; 29 U.S.C. § 794(a); and 28 U.S.C. §§ 2201 and 2202, providing for declaratory, equitable, and any further relief deemed necessary and proper.

16.     All of the events that give rise to this appeal took place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

17.     Aderyn is currently an eight-year-old student who received special education and related services in the District under a primary eligibility category of Emotional Disturbance and the secondary eligibility category of Other Health Impairment ("OHI"), arising from her ODD, Conduct Disorder, and ADHD diagnoses.

## IV.    <u>Standard of Review</u>

18.     This Court is required to undertake a fully independent review of the record and the hearing officer's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982).

19.     The Third Circuit requires "a district court to apply a nontraditional standard of review when considering an appeal from a state administrative decision under IDEA." *Mary T. v. School District of Philadelphia*, 575 F.3d 235, 241 (3d Cir. 2009). "Judicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson School District*, 70 F.3d 751, 757 (3d Cir. 1995). The standard is called modified de novo review.

20.     In conducting modified de novo review, district courts: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

21.     District courts shall accord due weight to the factual findings of the administrative agency. *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "Due weight" means that although the district courts must consider the administrative fact findings, the courts are free to reject such findings. *Id.* at 269-70.

22.     However, the modified de novo review does not apply to Section 504 and ADA

claims. *K.N. v. Glouster City Bd. Of Edu.*, 379 F. Supp. 3d 334, 344 (D.N.J 2019). Thus, a federal district court applies a de novo standard of review for the Section 504 and ADA claims. *Id. (citing T.F. v. Fox Chapel Area Sch. Dist.*, 589 F.App'x 594, 598 (3d Cir. 2014)).

**V.    Legal Authority**

**A.    IDEA requires that a school district identify all children with disabilities who live in the district through a comprehensive special education evaluation.**

23.    The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

24.    "The express purpose of . . . [IDEA] is to 'ensure that *all* children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . .'" *Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 244-45, 129 S.Ct. 2484, 2494 (2009) (*citing* 20 U.S.C. § 1400(d)(1)(A); *School Comm. of Burlington v. Department of Ed. of Mass.*, 471 U.S. 359, 369-70, 105 S.Ct. 1996 (1985)) (emphasis supplied).

25.    "IDEA's 'child find' requirement, pursuant to which States are obligated to 'identif[y], locat[e], and evaluat[e]' '*[a]ll* children with disabilities residing in the State' . . . ensure[s] that they receive needed special-education services." *Id.* at 245 (*citing* 20 U.S.C. §§ 1412(a)(3)(A), 1412(a)(10)(A)(ii)) (emphasis supplied).

26.    "A reading of [IDEA] . . . that left parents without an adequate remedy when a school district unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly

6

identifying each child eligible for services." *Id.*

27.     School districts have a continuing obligation to properly evaluate and accurately identify all students who are reasonably suspected of having a disability and offer a FAPE to every disabled student through an IEP. 34 C.F.R. § 300.323.

28.     The failure to timely evaluate a child once the school district knows of behaviors that could indicate a disability is known as a Child Find violation. *W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791 (3d Cir. 2007); *see also Ridley School Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012) (the Third Circuit has "infer[red] a requirement that [schools identify disabled children] within a reasonable time after school officials are on notice of behavior that is likely to indicates a disability"); 20 U.S.C. § 1412(a)(3)(A), (B); 34 C.F.R. § 300.111.

29.     The Child Find obligation is designed to identify every child with disabilities, as it includes all "children who are suspected of having a disability," including children who receive passing grades and are "advancing from grade to grade." 34 C.F.R. § 300.111(c).

30.     Pennsylvania codifies these Child Find duties at 22 Pa.Code §§ 14.121-14.125. Under Pennsylvania law, school districts must: (1) implement a "public outreach awareness system" to notify the public of its special education services; (2) establish a screening system to identify children requiring such services; (3) evaluate children suspected of requiring such services following receipt of permission from parents, or upon parents' request; and (4) reevaluate students where appropriate. *See* 22 Pa.Code §§ 14.121-14.124.

31.     To establish a Child Find violation, the school need only have "overlooked clear signs of a disability, be negligent in failing to order testing, or have no rational justification for not deciding to evaluate." *Regional School Dist. No. 9 Bd. of Educ. v. M.M.*, 2009 WL 2514064 at *11

7

(D.Conn. Aug. 7, 2009) (internal quotations omitted).

32.    In short, Child Find places the burden on school districts, rather than on parents, to identify a child as a student in need of services. *See Culley v. Cumberland Valley Sch. Dist.*, 758 F. App'x 301, 306 (3d Cir. 2018).

33.    For initial evaluations, "each public agency must conduct a full and individual initial evaluation" (34 C.F.R. § 300.301(a)) and the "screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for special education and related services." 34 C.F.R. § 300.302.

34.    A school district must use a variety of assessment strategies to gather relevant information about the child, and must assess the child "in all areas related to the suspected disability." 34 C.F.R. § 300.304(c)(4).

35.    The public agency must ensure that a student's "evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

36.    Despite the COVID-19 pandemic, the United States Department of Education did not waive requirements that public school districts provide FAPE to students with disabilities. *See Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak*, March 2020, available at, https://sites.ed.gov/idea/idea-files/q-and-a-providing-services-to-children-with-disabilities-during-the-coronavirus-disease-2019-outbreak/#Q-A-1.

37.    Public school districts' ongoing FAPE requirement also includes evaluating and obtaining the necessary data for progress monitoring and IEP development. *See Id.*

**B.** **After the school district identifies a student's needs in an evaluation report, the IEP Team must use the report to create an IEP and offer a student a Free Appropriate Public Education.**

38.     A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefits. *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982); *see also Endrew F. v. Douglas County School District RE-1*, ___U.S. ___, 137 S. Ct. 988, 999 (2017).

39.     The United States Supreme Court in its decision in *Endrew F.*, *supra*, emphasized that IDEA requires more than a program reasonably calculated to allow a student to make "*some* progress." *Endrew F.*, 137 S. Ct. at 997, 1000-01 (emphasis added). Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

40.     In addition, an "educational program must be appropriately ambitious in light of her circumstances," as minimal "progress from year to year can hardly be said to have been offered an education at all. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* at 999-1000.

41.     The progress standard set forth in *Endrew F.* is therefore consistent with, and expands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably calculated to allow a student to make *meaningful* educational progress and achieve "significant learning." *Brandywine Heights Area School Dist. v. B.M.*, 248 F. Supp. 3d 618, 632 (E.D. Pa. 2017).

42.     It is well-settled that "education" extends beyond discrete academic skill, and

includes the social, emotional, behavioral, and physical progress necessary to move the child to-

ward meaningful independence and self-sufficiency consistent with the child's cognitive potential.

*M.C., supra*, 81 F.3d at 393-94; *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853

F.2d 171, 181-82 (3d Cir. 1988); *Kruelle v. New Castle County School Dist.*, 642 F.2d 687, 693

(3d Cir. 1981).

     **C.**     **A child is entitled to full days of compensatory education where the denial of a FAPE permeated the child's entire school day.**

     43.     The IDEA gives courts "broad discretion" to award compensatory education as an

"equitable remedy" for students who have been denied a FAPE. *Reid v. District of Columbia*, 401

F.3d 516, 522-23 (D.C. Cir. 2005).

     44.     The compensatory education award must "provide the educational benefits that

likely would have accrued from special education services" that the school district "should have

supplied in the first place." *Id.* at 524.

     45.     "[I]n a case such as this, where the school district's failure to provide specialized

services permeated the student's education and resulted in a progressive and widespread decline in

her academic and emotional well-being, . . . 'parsing out the exact amount of hours [a student] was

not benefitted by [a] FAPE . . . would place an arduous and near impossible task upon the admin-

istrative bodies.'" *Jana K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 609-10 (M.D. Pa.

2014) (*quoting Keystone Cent. School Dist. v. E.E.*, 438 F. Supp. 2d 519, 525-26 (M.D. Pa. 2006)).

     46.     In such cases, an award of full days compensatory education may be appropriate

"when the overall effect of a district's failure to provide a FAPE resulted in a pervasive loss of

education benefit to the student." *Id.* at 610 (*citing Tyler W. v. Upper Perkiomen Sch. Dist.*, 963 F.

Supp. 2d 427, 438-39 (E.D. Pa. 2013) (finding that when student makes little to no academic

10

progress, it indicates that the district's failure to address his needs pervaded his entire school day and warrants the award of full days compensatory education); *Penn Trafford Sch. Dist. v. C.F.*, 2006 WL 840334 at \*9 (W.D. Pa. Mar. 28, 2006) (awarding full days compensatory education for period of deprivation because IEP "failed to confer any meaningful educational benefit")).

**D.      Liability under Section 504 and the ADA is similar to, but broader than, that under IDEA.**

47.      Under Section 504, recipients of federal funds such as the School District are required to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

48.      Section 504 and the IDEA "do similar statutory work." *P.P. ex rel Michael P. v. West Chester Area School Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). "Section 504 "is parallel to the IDEA in its protection of disabled students: it protects the rights of disabled children by prohibiting discrimination against students on the basis of disability, and it has child find, evaluation, and FAPE requirements, like the IDEA." *Id.*

49.      Similar to IDEA, Section 504 and its regulations require the identification of all children with disabilities and the provision of appropriate educational services. 29 U.S.C. § 794; 34 C.F.R. § 104.1 *et seq.*

50.      Section 504 requires that "a public elementary or secondary education program

11

shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; *see also Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999).

51.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

52.     A school may violate Section 504 independent of any violations of IDEA. *See Lauren G. v. West Chester Area School Dist.*, 906 F. Supp. 2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which no relief was granted under IDEA).

53.     Indeed, "Section 504 defines disability more broadly than the IDEA, and thus, some students covered by Section 504 are not covered under the IDEA." *Batchelor v. Rose Tree Media School Dist.*, 759 F.3d 266, 269 n.4 (3d Cir. 2014) (*compare* 20 U.S.C. § 1401(3) *with* 42 U.S.C. § 12102(1) (incorporated by reference in 29 U.S.C. § 705(9)(B))).

54.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *James S. v. School Dist. of Phila.*, 559 F. Supp. 2d 600, 620 (E.D. Pa. 2008).

55.     To establish a violation of Section 504, a plaintiff must prove that: (1) she is "disabled" as defined by the Act; (2) she is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) she was excluded

from participation in, denied the benefits of, or subject to discrimination at, the school. *Ridgewood*, 172 F.3d at 253.

56.     Where a school district violates IDEA and Section 504, it also violates the ADA. The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). That court held that, in the specific context of denial of FAPE claims, "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. *Id.*; *Terence D. v. School Dist. of Philadelphia*, 548 F. Supp. 2d 162, 169-70 (E.D. Pa. 2008) (applying same analysis to claims under ADA as to claims under Section 504).

**E.      A parent is entitled to attorney's fees and costs if they are the prevailing party.**

57.     The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a; *see also Andrew M. v. Delaware County Office of Mental Health/Mental Retardation*, 2005 WL 783070 at *15 (E.D. Pa. 2005) (attorneys' fees are recoverable under Section 504); *Daniel S. v. Scranton School Dist.*, 230 F.3d 90, 95 (3d Cir. 2000) (attorneys' fees are recoverable under IDEA); *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311 (3d Cir. 2006) (attorneys' fees are recoverable under the ADA).

58.     Section 504 and the ADA additionally permit more expansive costs, including expert witness fees. *L.T. v. Mansfield Twp. School Dist.*, 2009 WL 248818139 at *2 (D.N.J. Aug. 11,

2009) ("plaintiffs are entitled to reimbursement of their expert fees for their prevailing party status on their Rehabilitation Act claim"); *see also M.M. v. School Dist. of Philadelphia*, 142 F.Supp.3d 396, 413 (E.D. Pa. 2015) ("Plaintiffs are entitled to recover expert fees under Section 504 and/or the ADA").

## VI.    **Factual History**

59.    Plaintiffs incorporate by reference the preceding paragraphs.

60.    Aderyn's mother reported to the School District in Aderyn's initial registration paperwork that Aderyn presented with social, emotional, behavioral, and learning struggles while in preschool.

61.    For example, in the registration paperwork Aderyn's mother reported that Aderyn "can be difficult to teach unless interested in the topic," and that she is "stubborn" and "short-sighted."

62.    Aderyn's mother also reported in the registration paperwork that Aderyn has "periodic episodes of struggles with management of emotions."

63.    No one from the School District contacted Aderyn's mother regarding the information she reported in the registration paperwork and it was not shared with Aderyn's kindergarten teacher.

64.    From the first day of kindergarten Aderyn's behaviors indicated the need for a special education evaluation.

65.    Specifically, Aderyn was hitting, spitting, making disruptive noises (including yelling, howling, barking, fake sneezing, and making spitting noises), licking her body and the floors, picking her skin, hitting her own face, and pulling out her own hair and then sucking on it.

66.    In the first month of kindergarten, Aderyn was also presenting with significant

social needs, including aggressiveness, verbalizing that she did not want friends and did not care about hurting others' feelings, and engaging in a host of other off-task and distracting behaviors.

67.    Aderyn's mother and the kindergarten teacher discussed having Aderyn evaluated for special education early in her kindergarten year, but the teacher instead referred Aderyn to the School District's Multi-Tiered System of Support ("MTSS"), which is merely a general education intervention and does not include any parental involvement.

68.    The MTSS process quickly proved ineffective for Aderyn early in her kindergarten year.

69.    Two inadequate goals were established for Aderyn as part of MTSS; one related to reducing disruptive noises during instruction to no more than one every five minutes—which even if mastered would still allow for significant amounts of disruption throughout the instruction day— and one related to transitioning from a preferred activity with no more than one prompt.

70.    Initially, the first MTSS goal shows that Aderyn was disrupting class multiple times every five minutes establishing that the School District was on notice of Aderyn's extreme behavioral needs.

71.    Next, data collected on these two MTSS goals in October of 2019 revealed that Aderyn did not meet either goal, and while it appears that at least one additional MTSS meeting occurred in December of 2019, no further data was taken on either goal.

72.    Moreover, no data was taken after the first two months of kindergarten on any of the other significant, additional behaviors Aderyn was engaging in (that are not accounted for in the two MTSS goals).

73.    During kindergarten, Aderyn was issued a report card that allowed for three possible reporting options on social, emotional, behavioral, and executive functioning needs: "needs

15

improvement," "progressing," and "demonstrates consistently."

74.    Aderyn's kindergarten report card shows on-going social, emotional, and behavioral struggles with no improvement in following directions, maintaining attention, organizational skills, following classroom routine, completing work on time, listening without interrupting, following rules, exhibiting self-control and managing emotions, and accepting responsibility for her actions.

75.    Despite documenting her failure to progress socially, emotionally, behaviorally, and with respect to her executive functioning needs through her report cards, the School District did not initiate a special education evaluation during her kindergarten year.

76.    The start of first grade proved no different and Aderyn continued to exhibit significant social-emotional, behavioral, and now learning needs in both the virtual and in-person learning environments from the very start of the school year (2020-2021).

77.    Specifically, during first grade Aderyn would engage in meltdowns, crying, self-injurious behaviors, attention seeking behaviors, and making noises.

78.    Aderyn's first grade teacher, Nancy Wein, also reported that Aderyn required constant reminders to take out materials and complete daily work, would refuse to do work or put materials not needed away, would call out answers, was mostly inattentive and distracted, was rarely prepared for class, did not have her materials, did not complete any review for tests, laid on her desk, had difficulty transitioning, refused to complete most assignments, ate dirt and grass when on the playground, pulled out her hair during meltdowns, and sometimes completely shut down and lay in the fetal position.

79.    Ms. Wein also reported that due to her behaviors, Aderyn was performing below grade level expectations.

16

80.     Again, Aderyn's first grade report card also shows numerous areas of struggle without progress in social-emotional and behavioral areas during the first two trimesters.

81.     Remarkably, Ms. Wein claimed that she had no basis to believe that Aderyn needed special education services.

82.     Concerned for her emotional well-being and lack of academic success, Aderyn's mother sought out a private psychological evaluation of Aderyn in the fall of 2020 (first grade).

83.     Aderyn's mother provided a private psychological report to the District on November 30, 2020.

84.     On December 2, 2020, the mother requested a special education evaluation.

85.   The School District issued a Permission to Evaluate Form on December 11, 2020, which the mother signed and returned on December 14, 2020.

86.     The School District issued its Evaluation Report on February 12, 2021, and on March 11, 2021, offered an IEP in response to that Evaluation Report.

87.     Despite Aderyn's significant behavioral needs, when the School District finally offered an IEP in March of 2021, the District proposed only an itinerant level of emotional support with Aderyn spending approximately 90% of her day in the larger regular education classroom with up to 25 students where her regular education teacher was expected to implement the accommodations, supports, and behavior plan with little support.

88.     Ms. Wein, who was Aderyn's first grade teacher, went out on leave shortly after the March 2021 IEP went into effect and was unable to testify about Aderyn's progress or lack thereof.

89.     Ms. Gaffney, Aderyn's special education teacher, explained that she did not formally collect data on any of the goals in the IEP. The only evidence with regard to progress was

the testimony of Aderyn's mother and report card data.

90.    The mother was clear in her testimony that Aderyn's behaviors and social-emotional difficulties continued unabated from March through May of 2021 and that she saw no meaningful improvement in Aderyn.

91.    Aderyn's first grade report card shows ongoing struggles with little progress in many areas including following directions, maintaining attention, exhibiting organizational skills, completing work on time, listening without interrupting, exhibiting self-control and managing emotions, and accepting responsibility, all of which are related to Aderyn's goals.

92.    Given concerns over Aderyn's progress, or lack thereof, along with other issues and concerns, Aderyn's mother ultimately decided to remove Aderyn from school in May of 2022, and homeschooled her until Aderyn started living with the Parent in August of 2022.

## VII.    The Hearing Officer's Errors

93.    Plaintiffs incorporate by reference the preceding paragraphs.

94.    The Hearing Officer erred by concluding that the School District satisfied its Child Find obligations and timely and sufficiently evaluated and identified Aderyn's complete educational needs; clearly, the District failed in satisfying these obligations.

95.    In fact, Aderyn's mother made the School District aware in Aderyn's initial registration paperwork (before she began kindergarten) that Aderyn presented with social, emotional, behavioral, and learning struggles in preschool.

96.    The School District was on notice that Aderyn may be in need of special education services due to significant and highly troubling social-emotional and behavioral struggles during the beginning of her kindergarten year (the 2019-2020 school year).

97.    The Hearing Officer's conclusion that the School District was not on notice of

behavioral needs until during January of Aderyn's first grade year (January 2021) is not supported by the record.

98.     The School District should have offered to evaluate Aderyn in her kindergarten school year and should have adequately assessed all of her educational needs, including her social, emotional and behavioral needs. Had the District completed such a comprehensive evaluation during kindergarten, when she began demonstrating needs, her complete educational needs would have been adequately addressed.

99.     The School District failed to timely identify Aderyn's needs and thus failed to timely offer her an IEP to address those needs.

100.    As a result of the District's failure to implement an IEP until March of 2021 (Aderyn's first grade year), she failed to make meaningful educational progress from the middle of her kindergarten year (2019-2020) to March of her first grade year (March of 2021).

101.    The Family generally identifies the "middle" of Aderyn's kindergarten year as the point in which her Child Find claim begins to accrue, as the School District would have had 60 calendar days to evaluate Aderyn after a parent signed a Permission to Evaluate Form (20 U.S.C. § 1414(a)(1)(C)(i)(I)), 30 days to create an IEP and convene an IEP meeting (34 C.F.R. § 300.323(c)), and 10 days to implement the IEP following a parent's agreement to initiate special education services (34 C.F.R. § 300.300(b)).

102.    Given that the School District was aware of Aderyn's need for a special education evaluation before she began kindergarten, even allowing the School District 100 calendar days to implement an IEP, results in Aderyn's Child Find claim beginning to accrue in the "middle" of her kindergarten year, or mid-December of 2019.

103.    The Family's Child Find claim from December of 2019 through March of 2021, is

supported by the District's failure to identify Aderyn as having an Emotional Disturbance or Other Health Impairment.

104.    The District's belated identification of Aderyn as a child with a disability does not relieve the District of Child Find liability; rather it reinforces it.

105.    The Hearing Officer erroneously credited the School District for implementing its limited general education intervention services; however, Aderyn never met any of the goals set for her using those general education interventions and the failure to meet those goals did not result in the School District initiating a special education evaluation.

106.    Furthermore, general education interventions are not developed with parental input and are not the legal or practical equivalent of FAPE as IEPs.

107.    Finally, parents cannot challenge the adequacy of general education services in an administrative due process hearing or appeal to Federal Court to vindicate their child's rights.

108.    Because the District failed to offer an IEP and provide FAPE to Aderyn from the middle of her kindergarten school year, she is entitled to compensatory education from this period until her mother removed Aderyn from the School District.

109.    Aderyn's disabilities and resulting social, emotional, behavioral, and executive functioning needs pervaded her entire school day and impacted her in all classroom settings. Therefore, when computing hours of compensatory education due to Aderyn, it is respectfully submitted that she is entitled to full days of compensatory education to remedy the denial of FAPE.

110.    The School District failed to implement any IEP until March of her first-grade year; however, the Hearing Officer failed to find that this was a denial of FAPE.

111.    While the Hearing Officer was correct in holding that the March 2021 IEP failed to offer Aderyn a FAPE, the Hearing Officer erred in limiting her criticism of Aderyn's March 2021

20

IEP to only two IEP goals.

112.    The March 2021 IEP was deficient in other additional respects. It did not meaning-

fully address all of her needs and was therefore inappropriate and resulted in a further denial of

FAPE.

113.    Aside from recognizing the two inappropriate goals, the Hearing Officer errone-

ously held that the IEP was otherwise appropriate.

114.    More specifically, the March 2021 IEP contains inappropriate goals which fail to

appropriately address all of Aderyn's needs or provide a sufficient and objective means of moni-

toring progress. The IEP also includes inadequate and inappropriate specially designed instruction

("SDI"), inappropriate and/or insufficient behavior plans/supports not based on appropriate assess-

ments, no and/or insufficient related services, no meaningful supports for school personnel, no

and/or inappropriate extended school year ("ESY") services, and an inappropriate placement.

115.    The IEP failed to provide Aderyn with a program that allowed her to make mean-

ingful educational progress.

116.    The February 2021 Evaluation Report identifies social skills and executive func-

tioning skills as areas of need, as did both Ms. Wein and Ms. Gaffney (Aderyn's special education

teacher/case manager), yet the March 2021 IEP fails to include any goals in either area.

117.    Similarly, the Functional Behavior Assessment ("FBA") completed by the District

identifies four behavior areas of concern including "Crying Behaviors," which was defined by the

District as "withdrawing, laying on the chair in the fetal position, crying for extended periods[,]

[and] . . .whining." However, the IEP includes no goals related to this behavior area.

118.    Moreover, the level of expected achievement for the behavioral goals included in

the IEP are set far too low (three out of four goals are set to a 60% to 70% completion, which is

21

well below mastery and far too low for someone with Aderyn's ability level).

119.    The Hearing Officer erred by finding the kindergarten teacher (Ms. Neary) credible. *See Carlisle Area School v. Scott P by and through Bess P.*, 62 F.3d 520, 528-29 (3d Cir. 1995) (a district court may reverse a hearing officer's credibility determination where "non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or . . . [where] the record read in its entirety would compel a contrary conclusion").

120.    Ms. Neary's testimony that she had no reason to suspect that Aderyn may have a disability is belied by non-testimonial, extrinsic evidence. More specifically, Ms. Neary's recom-mendation that Aderyn participate in the MTSS services; Aderyn's failure to make progress to-wards her MTSS goals; Ms. Neary's reporting (on Aderyn's report card) that Aderyn was not making social, emotional, behavioral, and executive functioning progress; and, of course, the doc-umentation of Aderyn's abnormal behaviors during her kindergarten year: screaming, crying, hit-ting, spitting, barking, howling, picking herself until she bleeds and licking blood, pulling out her own hair, and the myriad of other behaviors she engaged in during kindergarten.

121.    The Hearing Officer erred by finding the first grade teacher (Ms. Wein) credible. *See Carlisle Area School, supra.*

122.    Ms. Wein's claim that she had no basis to believe that Aderyn may need special education services is belied by documentary evidence, namely, her own input into the evaluation report, including the completion of several rating scales where Ms. Wein rated Aderyn in the at-risk or clinically significant range (or very elevated depending on the rating scale) in almost every area, including very elevated scores (the highest score possible) on overall scales for ADHD inat-tentive type, ADHD hyperactive type, Conduct Disorder, and Oppositional Defiant Disorder.

123.    The District's failure to provide Aderyn with a FAPE, constituted a violation of not

only IDEA, but also Section 504 and the ADA.

## VIII.  Conclusion

WHEREFORE, the Plaintiffs respectfully request that this Court:

1.  Assume jurisdiction over this action;

2.  Hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3.  Reverse the Hearing Officer's decision;

4.  Declare that the School District violated IDEA, Section 504, the ADA, and Pennsylvania law;

5.  Find that the District violated its Child Find obligation and failed to timely and sufficiently evaluate and identify Aderyn's complete educational needs;

6.  Find that the District failed to offer a FAPE to Aderyn from December 2019 until May 2021;

7.  Order that the District must provide full days of compensatory education from December 2019 until May 2021;

8.  Order that the District develop an appropriate educational program for Aderyn;

9.  Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs; and

10.  Grant such other relief as this Court deems proper.

23

Respectfully submitted,

D. Daniel Woody, Esquire
ID No. 309121

Michael J. Connolly, Esquire
ID No. 82065

Dennis C. McAndrews, Esquire
ID No. 28012

McANDREWS, MEHALICK, CONNOLLY,
HULSE & RYAN, P.C.
30 Cassatt Avenue
Berwyn, PA 19312
(610) 648-9300 (phone)
(610) 648-0433 (fax)
Attorneys for Plaintiffs

24