**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **A.V., by and through her father, Stephen W., and STEPHEN W. in his own capacity,**<br><br>Plaintiffs,<br><br>*v.*<br><br>**WEST CHESTER AREA SCHOOL DISTRICT,**<br><br>Defendant. | **CIVIL ACTION**<br><br><br><br>**NO. 23-1306-KSM** |

<u>**MEMORANDUM**</u>

**Marston, J.**                                               **September 26, 2024**

During the 2019–20 and 2020–21 school years, A.V., a minor child, attended Westtown-Thornbury Elementary School within the West Chester Area School District ("the District"). (*See generally* Doc. Nos. 12, 13.)  A.V.'s father[1] brings suit against the District for failing to timely identify A.V. as a student in need of special education under the child find provision of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and for denying A.V. a fair and appropriate education ("FAPE") in violation of both statutes.  (Doc. No. 12.)  Presently before the Court are Plaintiffs' and the District's motions for judgment on the administrative record.  (*Id.*; Doc. No. 13.)  Following oral argument and for the reasons discussed below,

---

[1] Although A.V.'s mother filed the initial due process complaint, A.V.'s father is now the parent suing on behalf of A.V. as he was awarded sole legal and physical custody of A.V. in January 2022.  (Doc. No. 1; Doc. No. 16 at ¶ 88.)  As discussed *infra*, prior to January 2022, A.V.'s mother and father shared legal custody (Doc. No. 4-11 at 4), but A.V. lived primarily with her mother and her mother's then-partner (Doc. No. 4-10 at 35) and had limited interaction with her father (N.T. at 113:2–6, 130:15–16).

Plaintiffs' cross motion is denied and the District's cross motion is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

A.V. is presently a ten-year-old who resides with her father in Montgomery County, Pennsylvania attending elementary school in the Upper Merion School District where she is eligible for special education services.  (N.T. 63:8–21, 13:9–14.)

### A.    *A.V.'s Kindergarten Registration*

After A.V. turned five in July 2019, A.V.'s mother enrolled A.V. in full-day kindergarten for the 2019 fall term at Westtown-Thornbury Elementary School.  (Doc. No. 4-10 at 1–7.) Along with the registration paperwork, A.V.'s mother also completed an Entry Questionnaire and a Kindergarten Parent Survey.  (*Id.* at 8, 14.)[2]  On the survey form, A.V.'s mother stated that A.V. had previously attended preschool at the Warwick Child Care Center.  (*Id.* at 8.)[3]  She noted A.V.'s strengths as "outgoing, bright, playful, energetic" and her weaknesses as "can be difficult to teach unless interested in the topic, stubborn, short sighted."  (*Id.*)  Additionally, next to "challenging behaviors," A.V.'s mother stated that A.V. periodically struggled to manage her

---

[2] A.V.'s mother completed the Entry Questionnaire on July 15, 2019 (A.V.'s mother mistakenly wrote 2018 not 2019) and the kindergarten registration paperwork on August 5, 2019.  (Doc. No. 4-10 at 7, 14.) On the Entry Questionnaire, A.V.'s mother stated that A.V. lived with her; although she provided the name of A.V.'s father, she gave no additional contact information.  (*Id.* at 14.)  By contrast, A.V.'s mother did not list A.V.'s father as a parent on the registration paperwork.  (*Id.* at 3.)  Instead, A.V.'s mother included her then-partner's contact information because although her then-partner did not technically live in the same household, A.V.'s mother reported that he slept at their house or they slept at his house 2 to 3 nights per week.  (*Id.* at 4, 35.)  Similarly, A.V.'s mother listed her then-partner as A.V.'s father on A.V.'s school health record form.  (*Id.* at 9.)

[3] The survey noted the information provided would be used to determine the best placement for the child. (Doc. No. 4-10 at 8.)  A.V. was placed in Mrs. Alicia Neary's kindergarten class.  (*Id.* at 21.)  Mrs. Neary stated she never asked to see A.V.'s registration file and never saw any of the information provided by A.V.'s mother on the survey form.  (N.T. at 130:17–131:1, 134:16–20.)

emotions.  (*Id.*)  A.V.'s mother explained that she found firmness, consistency, and reward-based approaches worked best in managing A.V.'s challenging behaviors.  (*Id.*)

### B.    *2019–2020 School Year: Kindergarten*

#### 1.    Early Kindergarten: August–December 2019

On August 26, 2019, A.V. started kindergarten in Mrs. Neary's class[4] with no record of any developmental diagnosis or disorders.  (Doc. No. 4-10 at 21; Doc. No. 16 at ¶ 9; 2019–20 Academic Calendar.)  Mrs. Neary knew A.V. had just turned five years old in July and therefore was a "young kindergartener."  (N.T. 119:6–8.)  As the year began, Mrs. Neary also learned that A.V. lived with her mother on a farm where her mother worked, that A.V. did chores and worked in the barn, and that it appeared that A.V. had not been exposed to much socialization with peers.[5]  (*Id.* at 107:3–108:3.)

Soon after school began, Mrs. Neary observed A.V. demonstrate some behavioral issues, but nothing unusual for a child like A.V. who had just turned five and who did not appear to have had a lot of structure prior to coming into kindergarten.  (*Id.* at 75:25–76:14.)  In the first month of school, Mrs. Neary communicated with A.V.'s mother on an almost daily basis to discuss A.V.'s adjustment to school.[6]  (Doc. No. 4-10 at 57; HO-2 at 51:18–25 (A.V.'s mother

---

[4] Mrs. Neary had a teaching certificate for elementary kindergarten to 6th grade and over six years' teaching experience in the fall of 2019.  (Doc. No. 16 at ¶ 10.)

[5] That fall, A.V.'s mother informed Mrs. Neary that A.V.'s father, Stephen W., who now has legal custody, had not seen A.V. for a long time and that it was a "soft spot" for A.V.  (N.T. at 113:2–6; *see also id.* at 130:15–16 (Mrs. Neary testifying, "Mom did let me know that dad was not involved and that it hurt [A.V.]").)

[6] As the year continued, Mrs. Neary noted that A.V. was very anxious about Mrs. Neary's communication with her mother as A.V. feared it would lead to punishment at home and the imposition of additional chores.  (N.T. 107:15–25 (Mrs. Neary testifying, "She was always very nervous about communication with mom and what would happen as her punishment at home.  Q: And what did that nervousness look like?  A: Sometimes crying, sometimes pleading don't tell my mom").)  Later on, during virtual school in first grade, A.V.'s teacher personally observed A.V.'s mother yelling and cursing at A.V. for failing to complete her chores.  (*Id.* at 194:20–195:15.)

testifying that at the beginning of the year, she and Mrs. Neary communicated at least every other day, and communicated less frequently over time); *id.* at 121:9–11 (A.V.'s mother testifying that she spoke with Mrs. Neary roughly at least once per week).)

During that time, A.V. exhibited multiple disruptive behaviors, including hitting, spitting, making noises such as yelling, howling, barking and fake sneezing, hitting other students, licking her body and the floors, picking her skin, and pulling out her hair and sucking on it.  (Doc. No. 4-10 at 55–56.)  For example, Mrs. Neary's notes indicate that on September 5, 2019, A.V. tapped on the sides of her chair to distract peers, made spitting noises 5 times, and faked sneezing during group instruction.  (*Id.* at 56.)  Mrs. Neary also noted that A.V. particularly struggled with transitioning from preferred to non-preferred tasks.  (Doc. No. 16 at ¶ 18.)

But, Mrs. Neary stated that many of A.V.'s behaviors, such as hitting, spitting, disruptive noises, sucking on hair, and licking her own blood were "extremely typical" of a young kindergartener, who did not attend formal preschool.[7]  (N.T. at 75:25–85:12.)  And, although she noted that a few of A.V.'s behaviors were a little more unusual, such as fake sneezing and howling, pulling out her own hair, and trying to pick through three layers of skin (N.T. at 83:19–84:5, 85:17–87:12), Mrs. Neary believed with the proper interventions in place these behaviors would become less frequent (*id.* at 106:13–17).

By early October, Mrs. Neary informed A.V.'s mother that she was referring A.V. for Multi-Tiered System of Support ("MTSS") services to help A.V. succeed in kindergarten.[8]  (*Id.*

---

[7] Mrs. Neary admitted that A.V.'s mother referenced A.V.'s prior preschool experience once in email correspondence on September 11, 2019.  (N.T. at 143:5–25; *see also* Doc. No. 4-10 at 150.)  But during Mrs. Neary's testimony she stated that in her experience attending a day care for preschool was a little different than attending a formal preschool.  (N.T. at 134:4–6, 143:11–18 (Mrs. Neary testifying that in her experience, "you can tell who's been in a formal preschool program when they come to you.").)

[8] In September 2019, A.V.'s mother emailed Mrs. Neary requesting an "intervention of some kind" if A.V.'s behavior continued.  (Doc. No. 4-10 at 150; HO-2 at 61:9–62:1.)  A.V.'s mother also testified that

at 117:15–23.)  The MTSS process is implemented by a team that includes the school

psychologist[9], school counselor, reading specialist, intervention specialist in math, instructional

coach, school principal, and the regular education teacher of the student being referred.  (*Id.* at

237:10–20.)

    The MTSS process has three tiers with all students automatically receiving Tier 1 support

through whole group instruction in the regular education classroom.  (*Id*. at 78:8–18, 242:1–18.)

The team meets and reviews data provided by the regular education teacher regarding the

student's curriculum-based assessments, interventions that have been tried in the classroom, and

the student's response to those interventions.  (*See* Doc. No. 4-10 at 54–60.)  The team then

helps develop either Tier 2 or Tier 3 interventions and specific goals for the student.  (N.T. at

242:14–23.)  Tier 2 involves interventions which include more tailored instruction to the

student's particular needs.  (*Id.* at 242:7–13.)  And Tier 3 involves more intensive interventions

that include setting particular goals for a student, along with increased small group or one-on-one

support to assist in meeting those specific goals.[10]  (*Id.* at 242:14–23.)

---

she believed she had conversations with Mrs. Neary and the school principal within the first month of
school inquiring about whether A.V. needed an evaluation.  (HO-2 at 52:10–54:7.)  But, Mrs. Neary did
not recall any conversation about A.V. possibly having a disability.  (N.T. at 124:12–15.)  The hearing
officer found Mrs. Neary's testimony more credible that A.V.'s mother.  (Doc. No. 5-1 at 16.)

[9] The school psychologist testified that she believed the MTSS inventions were appropriate for A.V.
(N.T. at 240:15–241:22.)  The psychologist stated that the concerns regarding A.V.'s behavior did not rise
to the level that would trigger a special education evaluation because at the time, A.V. was "a very young
student coming in.  She had a summer birthday so she had just turned 5, and we were seeing some
disruptive behaviors in the classroom but none to lead us to believe that she needed special education
services . . . . It was something that the teacher was very willing and able to intervene and help her make
progress and see what progress she would make with the interventions of MTSS."  (*Id.*)

[10] Unlike an IEP, MTSS does not require formal data collection and there is no parental participation in
the process.  (N.T. at 103:18–20, 282:25–283:4.)

A.V. started receiving MTSS Tier 2 supports in early October 2019, which included alternative seating options to help A.V. focus, seating A.V. close to an instructional aide during lunchtime, modeling and reinforcing appropriate behavior, using reward incentives, etc. (Doc. No. 4-10 at 54–58.) When A.V.'s inappropriate behaviors continued, the MTSS team transitioned A.V. to Tier 3 interventions, and implemented goals to address two behaviors that interfered with her learning: (1) transitioning to a non-preferred activity, and (2) making disruptive noises. (Doc. No. 16 at ¶ 14.) Relating to transitioning to a non-preferred activity, A.V.'s goal was to transition away from a preferred activity with no more than one prompt, with a baseline of requiring a minimum of three prompts to transition. (Doc. No. 4-10 at 59.) Relating to disruptive noises, A.V.'s goal was to reduce the number of disruptive noise incidents during whole group instruction to not more than one disruption every five minutes, with a baseline of two disruptive noises every five minutes. (*Id.*) Mrs. Neary testified that one disruption every five minutes is typical for a five-year-old. (N.T. at 90:14–91:1.) To reach these goals, Mrs. Neary implemented multiple interventions, including ignoring A.V. when she made disruptions, redirecting her, using verbal and non-verbal prompts, using a sand clock to count down time remaining in an activity, and using a rewards-based behavior plan. (Doc. No. 4-10 at 59.)

Mrs. Neary testified that A.V. improved immensely with the help of the MTSS interventions, stating that A.V. made significantly less disruptive noises and demonstrated greater attention to tasks.[11] (N.T. at 119:4–120:4 (Mrs. Neary testifying, "She transitioned very,

---

[11] The Court finds it troubling that Mrs. Neary appears to not have realized that A.V. was actually receiving Tier 3 supports. (*See* N.T. at 79:3–7 (Mrs. Neary testifying, "I haven't been to Tier 3 with any of my students so my knowledge – so I would assume it would be different goals for the same goal with more strategies and interventions in place").) When asked to look at documentation showing Tier 3 supports in place for A.V. in kindergarten, Mrs. Neary confirmed the presence of Tier 3 data, but stated, "I don't feel super comfortable speaking to [a Tier 3 goal] because I don't make the goal." (*Id.* at 88:11–

very well.  Considering how she came in and the types of behaviors that you saw in the MTSS report, some of those had become completely nonexistent towards the end of the school year. She was really, really making progress.  She was making friends."); *id.* at 124:4–11 ("Q: Did [A.V.'s] level of energy differ significantly from her peers in her kindergarten class?  A: Maybe in the first few weeks.  But after we had things going in the right direction, no."); *id.* at 110:12–25 (Mrs. Neary testifying that the frequency of her emails to A.V.'s mother declined over time because the behaviors declined.)

Emails from Mrs. Neary to A.V.'s mother during this period also reflect this improvement.  (*See, e.g.*, Doc. No. 4-10 at 152 (Oct. 8, 2019 email from A.V.'s mother to Mrs. Neary saying, "I'm just emailing to check in on [A.V].  How has she been doing the last two weeks?  No news is good news?"); *id.* at 153 (Oct. 10, 2019 email from Mrs. Neary to A.V.'s mother saying, "Overall, we have all seen improvements from the start of the year – She certainly has subsided putting her hands/feet, etc on anyone else.  Having her sit in the area directly behind the carpet helps her maintain her personal space . . . . What I'm mostly seeing right now is inappropriate noises (fake sneezing, humming, squealing, hissing, etc) on a pretty consistent basis. . . . so we will definitely be trying to target that specific behavior with this plan. The other thing I'd like to try and correct is following directions the first time given . . . . Having said all of this, we are making strides in the right direction – We have to be mindful that she did just turn 5 and academically she is doing right where I'd hope.  I hope that you know how much I truly enjoy your daughter . . . ."); *id.* at 155 (Oct. 16, 2019 email from Mrs. Neary's to A.V.'s mother saying, "I mentioned . . . that we are collecting data . . . in regards to the disruptive noises

---

24.)  And there is no record that the District collected *any* additional data on A.V.'s MTSS goals after December 2019.  (*But see* Doc. No. 4-10 at 156 (Nov. 12, 2019 email from Mrs. Neary to A.V.'s mother stating "Overall she is making great progress, we are still working on her goals and *tracking data* for disruptive noises and transitioning.") (emphasis added).)

. . . . I just wanted to let you know that for whatever reason she had a very difficult morning when it came to not shouting out with disruptive noises (more so than most days).  She was also jumping and leaping straight up and down in her spot several times"); *id.* at 156 (Nov. 12, 2019 email from Mrs. Neary to A.V.'s mother saying, "Overall she is making great progress, we are still working on her goals and tracking data for disruptive noises and transitioning.  As an update, I use a 3 min timer with [A.V.] that is working really well to help her transition from a preferred task.").)

When the MTSS team met in early December 2019, the team agreed that although A.V. had not met all her MTSS goals,[12] she was improving.[13]  (*See* N.T. at 243:3–19.)  However, there was discussion regarding a new problematic behavior that Mrs. Neary had observed—A.V. had started taking the belongings of others.  (*See* Doc. No. 4-10 at 156 (Nov. 12, 2019 email from Mrs. Neary to A.V.'s mother saying, "I just wanted to let you know that I had to talk with [A.V.] today about not taking things from our classroom.  She admitted to taking feathers that belong in a math center and putting them in her pocket to take home."); *id.* at 157 (Dec. 3, 2019 email from Mrs. Neary to A.V.'s mother informing her that A.V. took a ballerina ornament from her mother's then-partner's home, and admitted to finding a brand new pack of pink ear buds on the floor of the classroom and taking them, despite at first claiming they belonged to her mother's then-partner); *id.* at 159–61 (Dec. 16–17, 2019 emails from Mrs. Neary and school principal to A.V.'s mother informing her that A.V. took a lip gloss that belonged to another student).)  This

---

[12] A.V. achieved her goal of reducing the number of prompts needed to transition from a preferred activity on 8 of 14 days observed in the morning session, and 5 of 13 days observed in the afternoon session. (Doc. No. 4-10 at 59.)  And A.V. achieved her goal of one disruptive noise every five minutes on 9 of 16 days observed in the morning session, and 13 of 13 days observed in the afternoon session.  (*Id.*)

[13] Mrs. Neary testified that in December, A.V. was doing great and that "the disruptive noises were much less, significantly less, and the attention to task had almost diminished."  (N.T. at 112:2–10.)

new behavior "wasn't frequent, but it was enough to reach back out to [A.V.'s mother] to let her know what's happening and bring that discussion to MTSS." (N.T. at 111:24–112:19.)  Thus, the MTSS team determined that it would be best for A.V. to continue with the Tier 3 goals and interventions, but with the added support of weekly 30-minute sessions with the school's mental health specialist to help A.V. process emotions and review coping strategies to overcome stressful situations that led to anger and frustration.  (*See* N.T. at 243:3–19; Doc. No. 4-10 at 49, 161.)

A.V.'s report card[14] for the first trimester, which ended in late November, showed that A.V. demonstrated progress toward meeting the standard required for the grade level and that she was developing an understanding of key concepts, processes, and skills in both Language Arts and Mathematics.  (Doc. No. 4-10 at 21–22; 2019–20 Academic Calendar.)  And for Science, Social Studies, the Special Subjects[15], and six of the fourteen Learning Behaviors assessed, A.V. was marked as "progressing."  (Doc. No. 4-10 at 22–23.)  For the remaining eight Learning Behaviors, A.V. received a "needs improvement."  (*Id.* at 22.)  These eight Learning Behaviors included follows written and/or oral directions, maintains attention, demonstrates organizational skills by following classroom routines, completes work on time, listens without interrupting, follows rules, exhibits self-control and manages emotions, and accepts responsibility for actions. (*Id.*)

---

[14] The report card used two different marking systems.  First, Language Arts and Mathematics used a 1-4 rating scale, with"4" indicating advanced performance, "3" indicating proficient, "2/2+" indicating basic and "1" indicating below basic performance.  (Doc. No. 4-10 at 21–22.)  Second, Science, Social Studies, Special Subjects and Learning Behaviors used a scale with three possible ratings:  "DC" = Does Consistently; "P" = Progressing; and "NI" = Needs Improvement.  (*Id.* at 22–23.)

[15] The Special Subjects included Art, Music, Physical Education, and Library.  (Doc. No. 4-10 at 23.) A.V. received progressing marks in all special subjects except for her "ability to demonstrate appropriate behavior" and "being prepared" in physical education and her "ability to follow basic rules and routines" in library, where she received "needs improvement." (*Id.*)

### 2.   Mid-Year Kindergarten: January–March 2020

Unfortunately, as soon as A.V. returned to school in January 2020, Mrs. Neary again had to alert A.V.'s mother that A.V. had been caught putting an instructional aide's watch in her bookbag and was sent to the principal's office.  (*Id.* at 163–66.)  Then, about ten days later, Mrs. Neary again emailed A.V.'s mother to explain that A.V. had stamped herself all over her face and arms as her "make-up."  (*Id.* at 167.)  Mrs. Neary also mentioned that that A.V. had an "off day in general"—for the first time in a long while, A.V. made her random animal noises and was non-compliant when given a direction.  (*Id.*)  Mrs. Neary explained A.V. was scheduled to meet with the mental health therapist the following day and could talk about her difficult day, but that Mrs. Neary wanted A.V.'s mother to know about her difficulties because they were "both working hard at supporting [A.V.] and trying to figure out what's behind some of the behaviors." (*Id.*)

Additionally, the record shows A.V. had two incidents involving violent behavior.  First, on January 24, 2020, A.V. hit another child multiple times leaving a mark while in art class.[16] (*Id.* at 168.)  Second, on March 5, A.V. was involved in a shoving altercation with another student which led to a recess detention.  (*Id.* at 173).  In addition to these incidents, in late February, A.V. was uncharacteristically disrespectful towards Mrs. Neary[17] (*id.* at 170) and on March 3, got angry when Mrs. Neary made her return a necklace given to her by another student (*id.* at 171).  Mrs. Neary's March 3, 2020 email to A.V.'s mother noted that A.V. was struggling

---

[16] Art was one of A.V.'s favorite classes and the art teacher mentioned A.V. normally does very well in class.  (Doc. No. 4-10 at 168.)

[17] Mrs. Neary's February 27, 2020 email discussing this incident was sent to both A.V.'s mother and father.  (Doc. No. 4-10 at 170.)  Based on the record, this appears to be first email communication with A.V.'s father.

early that week with following instructions.  (*Id.* at 171.)  Then on March 6, 2020, in the last

communication prior to the COVID-19 shutdown, Mrs. Neary informed A.V.'s mother that A.V.

had pretended to kiss two boys and sticked her tongue in their faces during lunch, but Mrs. Neary

added, "Aside from the incident at lunch she's doing well this morning."  (*Id.* at 174.)

The winter trimester ended on March 5, 2020.[18]  (2019–20 Academic Calendar.)  Despite

the District's claims that the MTSS Tier 3 supports remained in place for A.V. from December

2019 through March 2020, there were no additional team meetings held to discuss A.V.'s

progress during that period.  (N.T. at 111:5–16.)  And importantly, the District has no record of

any additional data that was recorded.[19]  Rather, Mrs. Neary stated that tracking data was very

difficult for her given her class size and after the December MTSS meeting, Mrs. Neary was

more concerned about A.V.'s "transitioning home life." (*Id*. at 145:4–20.)  Mrs. Neary believed

A.V.'s sessions with the mental health therapist were an additional intervention that helped

support A.V.  (*Id.*)

Even with A.V.'s continued struggles, Mrs. Neary testified that A.V.'s behaviors were

improving as A.V. was making friends, absorbing the social and emotional learning in the

classroom, and "had more tools in her toolbox to deal with her problems."  (*Id*. at 119:24–125:4.)

A.V.'s second trimester report card[20] showed that A.V. was improving academically in both

---

[18] Mrs. Neary testified that for parent-teacher conferences, she gave parents the option of an in person or phone call parent teacher conference, but A.V.'s mother did not sign up for either option in the lead up to the pandemic.  (N.T. at 95:3–15.)

[19] The school psychologist, a member of A.V.'s MTSS team, could not recall which team member was responsible for collecting data for A.V.'s MTSS Tier 3 goals and stated that she does not know whether the data exists somewhere in the District's system.  (N.T. at 268:11–17, 283:5–10.)

[20] A.V.'s father did not receive any performance information, such as report cards, when A.V. was in kindergarten.  (Doc. No. 16 at ¶ 21.)  A.V.'s father did not reach out to the District to inquire on A.V.'s progress, as A.V.'s mother told him that A.V. was "where she [was] supposed to be developmentally and academically."  (*Id.* at ¶ 22.)

Language Arts and Mathematics.[21]  In fact, many scores revealed significant progress toward meeting grade level expectations, and other scores demonstrated that A.V. consistently exceeded the standard required for the grade level.  (Doc. No. 4-10 at 21–22.)  And even though A.V.'s second trimester report card did not show any marked improvement with Learning Behaviors[22], Mrs. Neary stated this was just because the three categories used for grading failed to capture the nuances of A.V.'s improvement.  (*Id.*; N.T. at 98:6–18, 125:14–126:6, 141:13–142:8.)  Mrs. Neary testified that by March 2020 she was not concerned that A.V. had a learning disability given the academic success she had been able to achieve in kindergarten prior to the COVID-19 shutdown.  (N.T. at 75:12–18, 105:1–16.)  Rather, Mrs. Neary testified that "[w]e all saw a very big positive growth in [A.V.] academically, socially and emotionally."  (*Id*. at 126:21–23.)

### 3.   Remote Learning: March–May 2020

The COVID-19 pandemic forced the District to close its schools as of March 16, 2020. (Doc. No. 16 at ¶ 23.)  Shortly after the shutdown, the District moved to remote learning; however, given the difficulties with using Zoom with kindergarten age children, the District did not to make attendance a requirement that spring.  (N.T. at 123:8–10.)  Additionally, the District did not offer any MTSS supports for students during remote learning as these interventions were classroom-based.  (*Id*. at 243:20–244:8, 123:11–18 (Mrs. Neary testifying that "it would be really hard to implement any of the interventions that we were using at school not physically

---

[21] There was one Language Art skill, "reads high frequency words," where A.V. scored "below basic." (Doc. No. 4-10 at 21.)  But this was a new skill, which was not assessed in the first trimester.  (*Id.*)

[22] A.V. received virtually the same marks as in the first trimester for all the Learning Behaviors, except she improved to a "Progressing" notation for the "Accepts responsibility" behavior.  (Doc. No. 4-10 at 22.)  Her marks in the Special Subjects also remained consistent, although her ability to follow basic rules and routines in physical education dropped to "needs improvement."  (*Id.* at 23.)

being there with [A.V.]").)  The District did not report any additional grades for the 2019–20

academic year.  (Doc. No. 4-10 at 22.)

Mrs. Neary testified that A.V. did not attend Zoom lessons during the spring 2020.  (N.T.

at 121:7–10, 123:8–22.)  A.V.'s mother did not seek assistance for A.V. to access the virtual

instruction and the only communication in the record is one from A.V.'s mother asking whether

A.V. would be held back if she did not catch up on her school work, and Mrs. Neary responding

that the District was not retaining students due to the pandemic closure.  (*Id.* at 122:22–123:7;

Doc. No. 4-10.)

    **C.**    *2020–2021 School Year: First Grade*

    **1.**    **Early First Grade: August–October 2020**

As the COVID-19 pandemic continued, the District was forced to begin the 2020–21

school year virtually.  (Doc. No. 16 at ¶ 29.)  A.V. was placed in Nancy Wein's first grade

class.[23]  (N.T. at 150:17–20.)  Virtual learning remained difficult for A.V. because she lacked

support at home, since A.V.'s mother had a full-time job and was unable to sit with A.V. during

the school day.  (*Id*. at 189:25–190:15 (Mrs. Wein testifying, "I was very concerned that [A.V.]

did not have adult supervision at home and she was not attending Zoom and that really

concerned me.  She was turning off her camera or not coming back on time and not completing

activities or assignments, which is very typical of a 6-year-old who does not have any support.");

*id.* at 157:13–20, 252:13–17 (school psychologist testifying that A.V. did not have adult

supervision when she was observing A.V.'s remote learning for purposes of the evaluation

report); HO-2 at 67:16–25 (A.V.'s mother testifying that she "couldn't sit with her like most

---

[23] Mrs. Wein has a teacher certification for elementary education and had over twenty years' teaching
experience in the fall of 2020.  (Doc. No. 16 at ¶ 28.)  Mrs. Wein was on leave from mid-April 2021
through the end of the academic year.  (N.T. at 183:13–184:17.)

parents could, but I was 25 yards away"); N.T. at 193:18–24 (Mrs. Wein testifying that she believed A.V.'s mother was at the barn where she was working at the time A.V. was participating in Zoom lessons).)[24]  A.V. frequently turned off her camera during remote class sessions, was observed walking around in the background of her screen, submitted incomplete assignments, etc.  (*Id*. at 189:25–190:15; Doc. No. 4-10 at 177–79 (Oct. 1, 2020 email from Mrs. Wein to A.V.'s mother saying, "[AV] has been missing a lot of the direction instruction of our lessons. . . . This has been happening a lot lately."  "When we call on [AV], she is usually not there.  She comes in and out but usually misses the teacher instruction. . . . [She] was extremely upset during math today . . . . I met with her, tried to calm her down with belly breathing . . . . She kept repeating, I am in so much trouble. . . . She was hitting her face with her fist.  When I left her, she was going to her special and seem[ed] a bit calmer.")); *id.* at 186–87, 193–94, 198–99.)  The school psychologist agreed that this behavior was foreseeable because a six-year-old could not be expected to participate appropriately without adult supervision.  (N.T. at 252:13–22; *cf. id.* at 97:5–22 (Mrs. Neary testifying that the kindergarten Zoom classes were short because given their age, expecting a kindergarten student to be on Zoom for any extended period of time would be difficult).)

Mrs. Wein attempted to communicate with A.V.'s mother about A.V.'s difficulties attending Zoom sessions in the fall of first grade.[25]  (Doc. No. 4-10 at 186–87, 193–94, 198–99 (emails from Mrs. Wein to A.V.'s mother informing her that A.V. was missing class and not

---

[24] The District's records indicate that a staff member communicated with A.V.'s mother multiple times in October and November 2020 about assisting her in applying for childcare scholarships, but there is no suggestion in the record that such efforts, if any, were taken receptively by A.V.'s mother.  (Doc. No. 4-10 at 27–28.)

[25] Mrs. Wein also sent A.V.'s mother a daily checklist to help A.V. with her virtual learning, but A.V.'s mother reported she was unable to print it.  (Doc. No. 4-10 at 62.)

completing assignments).)  A.V.'s mother was frustrated that Mrs. Wein was unable to *immediately* text or email when Mrs. Wein saw A.V. was missing from virtual lessons.  (Doc. No. 4-10 at 177, 219–20 (Dec. 2, 2019 email from A.V.'s mother to Mrs. Wein and school principal stating, "it is IMPERATIVE that during virtual learning that SOMEONE . . . informs me that [A.V.] is not in class AT THE TIME that she is not in class. . . . [I]f I am alerted AS SOON AS IT IS NOTICED that she is not in attendance, I can take immediate . . . action").)  Mrs. Wein explained she was teaching a class of 25 children and could not just go and use the telephone as A.V.'s mother requested.  (*Id.* at 185; N.T. at 193:8–13.)  Moreover, Mrs. Wein became aware that A.V. was juggling more than just her virtual lessons as A.V. mentioned there were times she felt like she needed to complete her household chores before her mother returned from the barn.  (N.T. at 194:20–195:15 (Mrs. Wein testifying, "there was one time where [A.V.] had to clean the grease off the stove or fold clothes, and her excuse was she could not be on the Zoom because her mother told her if she didn't finish this before she got home, she was in big trouble").)  Mrs. Wein noted that A.V. often seemed worried about what she had to do before her mother came home and this made it harder for A.V. to stay focused on her schoolwork.  (*Id.* at 195:4–19.)

Shortly before A.V. transitioned to hybrid learning in October 2020, Mrs. Wein completed a form to resume MTSS supports for A.V.[26]  (Doc. No. 4-10 at 59–63.)  On this form,

---

[26] According to the District, A.V. only completed one formal round of MTSS interventions, as the second round was truncated due to the pandemic.  (N.T. at 255:23–256:17.)  On October 22, 2020, A.V. began her third formal round of MTSS interventions.  (*Id.*)  The school psychologist explained that when a student does not meet their MTSS goals, "[s]ome students after one round of MTSS might move to an evaluation.  Some students may never move to an evaluation because interventions are helping.  Some students might have two rounds of MTSS intervention and then move to an evaluation. . . . It depends on the student's progress."  (*Id.*)  Again, the Court notes its concern that no additional MTSS data appears to have been recorded after the first formal round of MTSS interventions.  (*Id.* at 271:2–19 (school psychologist testifying there is no data in the record as to A.V.'s Tier 3 MTSS goals in first grade, and Mrs. Wein's behavioral notes only provide anecdotal data).)

Mrs. Wein reported her concerns with attendance, behavior, and attention.  (*Id.* at 61–62.)  Mrs. Wein included the following behaviors that she had noted during virtual learning that were causing concern:  "Meltdown, crying, hitting self with fist, erases till the point of a hole in paper, get[s] extremely upset when things do not turn out the way she intended."  (*Id.*)  And she marked concerns that A.V. seeks attention, calls out, makes noises, puts things in front of camera, and turns her camera off when she doesn't want to finish work or a conversation.  (*Id.*)  Mrs. Wein noted the interventions she had used to date with A.V. during Zoom sessions such as small group/individual teacher support in a virtual break room, belly breathing, counting to 10, thinking of a happy place, verbal and non-verbal positive reinforcement, and ignoring negative behaviors.  (*Id.*)  Finally, Mrs. Wein reported that A.V. was evaluated as a "Level A" and "Level B" for her developmental reading assessment whereas the "grade-level expectations" were listed as Level D and E.[27]  (*Id.* at 60.)

On October 22, 2020, A.V. transitioned to a hybrid program of two days per week in-person, and two days per week with remote instruction.  (Doc. No. 16 at ¶¶ 29, 30.)  That same day, the MTSS team met and again provided A.V. with MTSS Tier 3 supports, including the sessions with the mental health therapist.[28]  (*Id.* at ¶ 30; N.T. at 270:19–271:4.)  In-person, with MTSS supports in place, Mrs. Wein observed certain behaviors, including:

---

[27] Neither Mrs. Wein nor the school psychologist were overly concerned that A.V. was not meeting grade level expectations at the beginning of first grade because of the pandemic disruptions.  (N.T. at 213:11–24; *see also id.* at 248:3–17 (school psychologist testifying that "I think all students to some extent . . . were performing behind where they possibly would have performed at the particular moment in their 1st grade careers due to the disruption to learning and being virtual for the last chunk of kindergarten as well as the first chunk of 1st grade").)

[28] Although the record does not include a completed Tier 3 form for A.V. in first grade, the school psychologist testified that Mrs. Wein filled out the Tier 2 form to "encapsulate what she had been doing with [A.V.]" so far, but that this was "not a prerequisite to [A.V.] continuing in Tier 3 since she had been mid-Tier 3 the previous year."  (N.T. at 270:4–11.)

- "[A.V.] needs constant reminders to take out materials and complete daily work. If you try to take something away she will shove [it] in her desk and will not give up the item. She make[s] noises, sits up on her feet, and will not do anything. She says she knows it already or I don't like it and don't feel like doing it. [A.V.] complains of being tired and hungry frequently."

- "[A.V.] is rarely prepared for class.  She does not bring her book bag or has the book bag but does not have the materials . . . .  She does not complete any review for the test and sends it back . . . incomplete."

- "[A.V.] lays on her desk, has a hard time transitioning and refuses to do or complete most of her assignments. If she does begin a task, she tends not to stay with it for long and says she done. She plays with and appears distracted by anything that is within reach including pencils, tools, etc."

(Doc. No. 4-10 at 46; *see also* N.T. at 171:11–172:7 (Mrs. Wein explaining that she observed these behaviors from the beginning of the year through January 2021).)  Mrs. Wein also stated that A.V. appeared to have friends and gave classmates encouragements and praise, but noted that A.V. reportedly ate dirt and grass, licked up spills on her desk, and pulled out her hair or hit her face with her fist when in a meltdown.  (Doc. No. 4-10 at 46.)  Mrs. Wein testified that she notified A.V.'s mother regarding some of these concerning behaviors, such as pulling out her hair, but that she did not observe these incidents frequently.  (N.T. at 171:11–172:6, 201:17–202:8.)

A.V.'s first trimester report card in first grade showed A.V. scored "below basic"[29] for three Language Arts skills and one Mathematics skill.[30]  (Doc. No. 4-10 at 24.)  As for the fourteen Learning Behaviors assessed, A.V. received the following:  four "Does Consistently"

---

[29] *See supra* n.14.  "Below basic" signifies that the student's performance demonstrated limited progress toward meeting the standard as required for the grade level; the student displayed insufficient understanding of the key concepts, processes, and skills.  (Doc. No. 4-10 at 24.)

[30] A.V. received progressing for Science and Social Studies.  (Doc. No. 4-10 at 25.)  And for the Special Subjects, A.V. received "basic" marks indicating her performance demonstrated progress toward meeting the standard required for the grade level.  (*Id.* at 24, 26.)

marks, four "Progressing" marks, and six "Needs Improvement" marks.  (*Id.* at 25.)  The six

Learning Behaviors marked as "Needs Improvement" included "follows written and/or oral

directions," "maintains attention," "demonstrates stamina to work independently," "seeks help

when appropriate," "listens without interrupting," and "exhibits self-control and manages

emotions."  (*Id.*)

> ### 2.    Mid-First Grade: November 2020–February 2021; The Special Education Evaluation

In November 2020, A.V.'s mother attended a parent teacher conference with Mrs. Wein

and the new school principal.  (HO-2 at 64:17–23.)  A.V.'s mother addressed a number of

concerns including the fact that she wanted A.V. evaluated and that the remote learning was not

working for A.V.[31]  (*Id.* at 65:3–20.)  On November 30, 2020, A.V.'s mother informed the

District that A.V. had been diagnosed with ADHD through a private evaluation, and on

December 2, 2020 she formally requested a special education evaluation.[32]  (Doc. No. 16 at ¶¶

34, 35.)  On December 11, 2020, the District gave A.V.'s mother the consent form, which A.V.'s

mother signed and returned on December 14, 2020.  (*Id.*at ¶ 35; Doc. No. 14-1 at ¶ 41.)  Also, on

December 14, the principal notified A.V.'s mother that A.V. would be permitted to return to

school in person 4 days a week.[33]  (Doc. No. 16 at ¶ 31; Doc. No. 4-10 at 195–96.)

---

[31] A.V.'s mother testified that there were "multiple, multiple discussions over a long period of time in E-mail, via phone, conferences regarding my daughter."  (HO-2 at 125:12–15.)

[32] On October 1, 2020, A.V.'s mother first told Mrs. Wein that A.V. was going to have "an assessment shortly," and that she would follow up with that provider's educational recommendations.  (Doc. No. 4-10 at 178.)  Then, on October 14, 2020, A.V.'s mother informed the District that A.V. had appointment on October 29 to be evaluated outside the District.  (*Id.* at 27.)

[33] A.V.'s mother testified that A.V.'s in-person education increased because she complained to the school principal and had recently requested a special education evaluation.  (HO-2 at 64:4–24, 66:10–67:4.)  During this period, the record shows that A.V. continued to submit incomplete assignments and miss Zoom classes.  (*See* Doc. No. 4-10 at 186–199 (six emails from Mrs. Wein to A.V.'s mother during December 3–17, 2020 period).)  Another email from Mrs. Wein to A.V.'s mother on December 22, 2020

The District evaluated A.V. as requested, and the school psychologist issued the

Evaluation Report ("ER") on February 12, 2021.[34]  (Doc. No. 16 at ¶¶ 36, 38.)  The ER

incorporated detailed parental input from A.V.'s mother,[35] input from Mrs. Wein, a cognitive

assessment (the Wechsler Intelligence Scale for Children – Fifth Edition ("Wechsler")),

Behavior Assessment for Children – Third Edition ("BASC-3") rating scales completed by Mrs.

Wein and A.V.'s mother, Conners-3 rating scales completed by Mrs. Wein and A.V.'s mother,

and the school psychologist's observations of A.V. on five separate dates including once during

remote instruction[36].  (Doc. No. 16 at ¶¶ 39, 42, 44–46.)

---

reported that A.V. had become frustrated and pulled a large lock of hair from her head.  (Doc. No. 4-10 at 200.)  A.V.'s mother responded in part, "That's pretty uncharacteristic of her."  (*Id.*)

[34] Although the school psychologist did not believe A.V. needed special education at the beginning of kindergarten in 2019, she recommended an evaluation for A.V. in first grade in accordance with A.V.'s mother's request because "We intervened at the intense level that occurred with her through MTSS . . . . And while she did make some progress, she was definitely doing better by the time we went out in March of her kindergarten year.  She was making a good amount of progress at that time.  But when we came back in 1st grade, there were more behaviors that were present, which very well was attributed to the time that we were on distance learning and hybrid learning and relearning all of the expectations in the classroom setting.  But her behavior as time went on came to light that they were impacting her academic functioning significantly, and that's why we ended up concluding that she qualified for special education in this report."  (N.T. at 259:24–261:2.)

[35] A.V.'s mother's input into the ER spanned ten full pages.  (Doc. No. 16 at ¶ 39.)  A.V.'s father did not provide any input.

[36] For example, among these observations, the psychologist noted that during Zoom instruction, A.V. left the screen 30 minutes after observation began while her classmates were reading and did not return to the screen when Mrs. Wein called her name.  (Doc. No. 4-10 at 50.)  The psychologist observed A.V. walking in the background of her screen and observed her folding laundry, but that she did not return to the screen before lunch.  (*Id.*)  Additionally, during one of the psychologist's in-person observations of A.V.'s writing class, she observed A.V. reading a book because she had left her iPad at home that day.  (*Id.* at 52.)  A.V. told Mrs. Wein that she finished her book, even though it was a large book with many stories, and Mrs. Wein told her to read another story.  (*Id.*)  A.V. looked at the book for one minute, then started looking around the room.  (*Id.*)  After one prompt, she returned to reading, but then closed the book and put her head down a few minutes later.  (*Id.*)  When prompted to keep reading, A.V. said she was tired, but lifted her head and opened the book again.  (*Id.*)  Mrs. Wein gave A.V. a notebook to prepare for transitioning to writer's workshop, but A.V. made howling noises, and did not stop until prompted twice.  (*Id.*)  She also did not stand as directed for an exercise break.  (*Id.*)  When Mrs. Wein started reading a book, A.V. put her head down and started making noises again but complied with

The ER revealed that A.V. has a Full Scale IQ in the high average range (88th percentile) and a General Ability Index score in the very high range (95th percentile). (*Id.* at ¶ 42.) A.V.'s assessment of academic achievement using the Weschler test generally reflected average range composite scores with the exception of the Oral Language Composite, which was in the above average range.[37] (*Id.* at ¶ 43.) For the BASC-3 rating scales, Mrs. Wein endorsed clinically significant concerns with anxiety, depression, attention problems, atypicality, adaptability, and study skills, as well as at-risk concerns with hyperactivity, aggression, conduct problems, learning problems, leadership, and functional communication. (*Id.* at ¶ 44.) A.V.'s mother endorsed clinically significant concerns with hyperactivity, aggression, and attention problems, and no at-risk concerns. (*Id.*)

Overall, the ER identified that A.V. needed to develop coping skills, emotional regulation, problem-solving strategies, and to improve attention and on-task behavior, and determined that A.V. was eligible for special education under the "Other Health Impairment" category for her ADHD and for "Emotional Disturbance." (*Id.* at ¶¶ 47, 48.) The ER also found that A.V. qualified for special education based on elevated levels of emotionality and behavior related concerns suggesting Oppositional Defiant Disorder. (Doc. No. 4-10 at 78–79, 100–01.) The ER recommended interventions such as small group social skills support, mental health support, frequent checks for understanding, small group instruction for independent work in

---

directions to stop. (*Id.*) Mrs. Wein testified that these observations represented A.V.'s typical behavior. (N.T. at 174:7–175:3.)

[37] A.V.'s overall Total Reading composite score fell within the average range (68th percentile), her mathematics composite score was average (55th percentile), and her overall oral language composite score was in the above average range (97th percentile). (Doc. No. 4-10 at 75.)

reading and mathematics, support for attention and focus, verbal praise, organizational assistance, movement breaks, and preferential seating.  (Doc. No. 16 at ¶ 49.)

In February 2021, the District also conducted a Functional Behavior Assessment ("FBA").  (*Id.* at ¶ 54; Doc. No. 4-9 at 17.)  The FBA involved direct observation of A.V. in the classroom for three hours and five minutes across two school days.  (Doc. No. 16 at ¶ 67.)  The FBA identified four behaviors of concern:  non-compliance, disruptive behavior, crying, and self-injury.  (*Id.* at ¶ 55.)  Based on informal review and direct observation, the hypothesized functions of the behaviors were determined to be as follows:  (a) for noncompliance, to gain access to preferred items or activities; (b) for both noncompliance and disruptive behavior, to gain adult attention; (c) for crying, to delay or avoid a task; and (d) for self-injury, to access sensory input.  (*Id.*)  The FBA provided numerous recommendations, including proactive/preventive strategies, proposals for teaching and reinforcing replacement and desirable behaviors, proposals for responding to challenging behaviors, and systemic recommendations. (*Id.* at ¶ 56.)

Both the ER and FBA were provided to both A.V.'s mother and father.  (*Id.* at ¶ 50; Doc. No. 4-9 at 25.)  A.V.'s father never acknowledged receipt but A.V.'s mother attended a meeting with the school psychologist to go over the ER, and in an email dated February 17, 2021, A.V.'s mother wrote that the District's FBA was "fantastic and incredibly helpful."  (Doc. No. 16 at ¶ 72; Doc. No. 4-9 at 25.)

### 3.    Late First Grade: March–May 2021; The IEP

Upon conclusion of the second trimester on March 9, 2021, A.V.'s second trimester report card was issued.  (2020–21 Academic Calendar.)  Her report card showed improvement in

all but four academic skills tested, with two skills rated as "below basic."[38]  (Doc. No. 4-10 at

24–25.)  Specifically, A.V. received a "basic" score again for "applies grade level phonics and

word analysis skills to decode words" and for "follows the writing process with support."  (*Id.* at

24.)  And she received the same "below basic" mark for "participates in collaborative

conversations" and for "listens and responds to comments of others."  (*Id.*)  Science, Social

Studies, and the Special Subjects also showed improvement.  (*Id.* at 25–26.)  But the report card

also indicated a marked decline in learning related behaviors, with 11 "Needs Improvement"

notations, whereas A.V.'s first semester report card only had 6 "Needs Improvement" notations.

(*Id.* at 25.)  Mrs. Wein stated that although A.V.'s second trimester did not demonstrate

significant movement from the six "Needs Improvement" notations A.V. received in the first

trimester for Learning Related Behaviors, A.V.'s behavioral conduct still improved throughout

the year.  (N.T. at 181:14–22, 197:3–199:1 (Mrs. Wein testifying that A.V. was "still struggling

in some areas and still having some issues, and she was definitely making progress," but that she

wasn't able to convey that progress with only three options on the report card).)  A.V.

maintained a "progressing" mark for "demonstrates initiative to produce quality work" but also

dropped from "does consistently" to "progressing" for "cooperates with others" and "follows

rules."  (Doc. No. 4-10 at 25.)  In addition to regressing in these two skills, A.V. also

demonstrated behavioral decline in the following skills:  "participates in classroom activities,"

"completes work on time," and "accepts responsibility for actions" (from "progressing" to

"needs improvement"); "demonstrates organizational skills by following classroom routines" and

"uses technology responsibly" (from "does consistently" to "needs improvement").  (*Id.*)

---

[38] Some academic skills were not scored in the first trimester.  (Doc. No. 4-10 at 24–25.)

The District developed an IEP for A.V. and scheduled the IEP team meeting via Zoom for March 11, 2020.  (Doc. No. 16 at ¶ 72.)  The following individuals were present at the IEP meeting:  A.V.'s mother, Mrs. Wein, Ms. Gaffney (the special education teacher), the principal, the District's local education agency representative, the school psychologist, and the gifted education teacher.[39, 40]  (Doc. No. 4-10 at 92.)  The IEP included the following needs: (1) coping skills, (2) emotional regulation, (3) problem-solving strategies, and (4) improving attention and on-task behavior.  (Doc. No. 16 at ¶ 58.)  Two annual goals in the IEP addressed increasing the use of coping skills and decreasing self-injury, both in relation to baselines; two other goals addressed non-compliance and on-task behaviors.  (*Id.* at ¶¶ 59, 60.)

The goal for non-compliance stated that A.V. will increase compliance with staff requests by following directions and typical classroom routines for 60% of her school periods per day over four consecutive school weeks.  (*Id.* at ¶ 62.)  The baseline for the non-compliance goal was derived from the FBA report that A.V. was non-compliant with 40% of requests.  (*Id.* at ¶¶ 63, 66.)  Likewise, the goal for on-task behaviors stated that A.V. will increase on-task behavior without displaying disruptive behaviors for 60% of her school periods per day over four consecutive school weeks, and her baseline was that she was off-task 24% of the 30-second intervals observed.  (*Id.* at ¶¶ 64, 65.)  The third goal was for A.V. to use a taught coping strategy in 70% of opportunities during perceived times of stress over three consecutive school weeks or three consecutive semesters, with a baseline of using a coping strategy in 40% of opportunities

---

[39] The gifted education teacher was included in the IEP meeting because although A.V. was found to have a disability, she also presented as a gifted student with extremely high verbal reasoning skills (*id.* at 79), and the goal was to incorporate a gifted IEP for her as well (*id.* at 98).  However, A.V.'s final IEP does not include any specific gifted support services.  (*Id.* at 125.)  A.V.'s mother approved the final IEP and did not include any concerns regarding the lack of gifted support services.  (Doc. No. 16 at ¶ 74.)

[40] Although A.V.'s father was an invited IEP team member (Doc. No. 4-10 at 86), he did not attend the IEP meeting (*id.* at 92).

observed.  (Doc. No. 4-10 at 115.)  A.V.'s last goal in the IEP was to reduce her self-injurious behaviors to an average of zero incidents per day over eight consecutive school weeks.  (*Id.* at 116.)  A.V. did not exhibit any self-injurious behaviors during the FBA observation period (Doc. No. 4-9 at 19), but this goal was included because staff in the past had observed her pulling her own hair (three times since the beginning of the school year) and putting wood chips in her mouth (at least twice) (Doc. No. 4-10 at 116).

The IEP also included a Positive Behavior Support Plan ("PBSP"), which involved use of a self-match/reward system.  (Doc. No. 4-10 at 89, 103.)  To address A.V.'s non-compliance with directions and disruptive behaviors, a positive reward chart was to be implemented where A.V. would review expected behaviors with staff at the beginning of the day and report at the end of every period whether she demonstrated the expected behavior.  (*Id.*)  If A.V. and a teacher agreed that she demonstrated an expected behavior, she would earn extra points; if they agreed that A.V. did not demonstrate the expected behavior, A.V. would earn fewer points; and if they disagreed on whether A.V. demonstrated the expected behavior, A.V. would not earn any points.  (*Id.*)  For crying behaviors, staff would attempt to calm A.V. down using "belly breaths" or counting to ten.  (*Id.* at 103.)  Additionally, the IEP provided for weekly individual mental health services and emotional and learning support at an itinerant level, with A.V. in general education for 88% of the day, and social skills and independent math and reading work in a separate classroom with a smaller group.  (Doc. No. 16 at ¶¶ 69, 70; Doc. No. 4-10 at 120–23, 129; HO-3 at 185:17–187:18, 196:17–197:13.)  Last, the IEP included a number of program modifications and Specially Designed Instruction ("SDI") for the PBSP, including prevention strategies,[41]

---

[41] For example, these strategies included providing A.V. with a 2-minute and 1-minute warning when transitioning tasks, breaking up larger assignments into more manageable sections, and scheduling movement breaks throughout the day.  (Doc. No. 4-10 at 117.)

teaching model behavior, reinforcement strategies for when A.V. performed the model behavior[42], and consequences for when A.V. performed concerning behaviors[43].  (Doc. No. 4-10 at 117–19; *see also id.* at 88–89 (listing program modifications and SDI).)  Last, the IEP included a recommendation for Extended-School Year services for social skills.  (*Id.* at 125, 132.)

Following the IEP meeting, the finalized copy of the IEP and a Notice of Recommended Educational Placement ("NOREP") was issued to both parents on March 18, 2021.  (Doc. No. 4-9 at 2.)  On March 28, 2021, A.V.'s mother returned the signed NOREP approving the IEP and did not indicate any concerns with the IEP other than that A.V. would miss one week of the Extended-School Year.[44]  (*Id.* at ¶ 74.)

The IEP was immediately implemented.[45]  (HO-3 at 194:17–22.)  As part of her program, A.V. met with the learning support teacher, Ms. Gaffney, three times each day for about 10 minutes to review expected behaviors during the general education classroom, receive rewards for demonstrating appropriate behavior, practice with role-modeling, and learn coping skill strategies.  (Doc. No. 16 at ¶¶ 75–77; HO-3 at 197:1–16.)  Ms. Gaffney talked to Mrs. Wein about A.V. and understood that Mrs. Wein believed A.V.'s behaviors were interfering with A.V.'s ability to access her education.  (HO-3 at 236:15–23.)  Ms. Gaffney testified that she did

---

[42] This includes the self-match/reward system described above.  (Doc. No. 4-10 at 118.)

[43] For example, "When [A.V.] displays disruptive behaviors by playing with materials, redirect once with a non-verbal prompt.  If she continues, calmly remove items from [A.V.]'s area and redirect her back to the task at hand by reminding her of the points she can earn on her reward sheet.  If behaviors continue, use non-verbal prompts."  (Doc. No. 4-10 at 119.)

[44] A.V.'s father did not return the NOREP.  (Doc. No. 16 at ¶ 73.)

[45] Shortly after, Mrs. Wein went out on leave; she did not testify regarding A.V.'s circumstances from that point forward.  (N.T. 183:13–184:8.)

not collect data on A.V.'s behavior following the IEP implementation because she typically spends time with new students to get to know them prior to collecting official data. (*Id.* at 195:21–196:7; Doc. No. 16 at ¶¶ 79, 80.) However, she did collect informal data using a daily behavior chart (the PBSP), which she took a photo of each day and sent to A.V.'s mother. (HO-3 at 202:3–11, 217:3–6; *see also* Doc. No. 4-9 at 27–55, 57–64 (example photographs of daily behavior chart sent to A.V.'s mother in April 2021).)

Before Ms. Gaffney could collect the required data, A.V.'s mother removed A.V. from the District on May 10, 2021.[46] (Doc. No. 16 at ¶ 78.) A.V. then transitioned to homeschooling by her mother, (Doc. No. 4-10 at 136), before starting attendance at Franklin Elementary School in Pottstown, PA in early 2022 (HO-2 at 41:20–42:1).

### D.    The Due Process Complaint

On January 13, 2022, A.V.'s mother filed a due process complaint with the Office of Dispute Resolution alleging violation of the IDEA, Section 504, and corresponding Pennsylvania Public School Code regulations. (Doc. No. 4-18.) She alleged the District should have initiated the special education evaluation process for A.V. "early on in kindergarten." (*Id.* at 5.) She also alleged that the IEP developed by the District was inadequate because it contained inadequate present education levels, and inappropriate goals which failed to address all of A.V.'s needs or provide a sufficient and objective means of monitoring progress. (*Id.*) She alleged that the IEP had inadequate SDI, insufficient behavior plans, and that the District's ER failed to fully assess A.V. in all areas of suspected disability, and therefore lacked critical information to determine A.V.'s needs. (*Id.* at 5–6.)

---

[46] At this point, there were still four consecutive weeks left in the school year, and the parties agree that if A.V. had remained in the District, Ms. Gaffney would have had enough time to collect data in accordance with the IEP goals. (Doc. No. 16 at ¶ 85.)

The matter proceeded to a due process hearing which convened on March 16 and April 4, 2022, with additional sessions scheduled for May 2022.  (Doc. No. 4-15 at 1.)  On May 11, 2022, counsel for A.V.'s mother advised the District's counsel and the administrative hearing officer that the mother no longer had physical custody of A.V.[47]  (*Id.*)  The officer granted a joint request for a brief continuance of the due process hearing sessions.  (*Id.*)  On May 26, 2022, A.V.'s mother's counsel requested an additional continuance in expectation of a family court ruling.  (*Id.* at 2.)  The District responded with a motion to dismiss for lack of standing because A.V.'s father, who had full custody of A.V., had been given the opportunity to intervene in the case, and effectively decided not to do so.  (*Id.*; *see also* Doc. No. 4-7 at 9.)  The hearing officer granted additional continuances, but because the mother had no additional information as of July 1, 2022, the officer granted the District's motion to dismiss.  (Doc. No. 4-15 at 4.)

A.V.'s father subsequently filed a new due process complaint on August 26, 2022 seeking compensatory education for the 2019–20 and 2020–21 school years up until A.V. ceased attendance in the District, in addition to reasonable attorney's fees and costs.  (Doc. No. 4-11.) He included substantially similar allegations as A.V.'s mother's initial complaint.  (*Id.*)

The hearing officer held one additional hearing in this matter on November 15, 2022 and incorporated the prior two hearing sessions as Hearing Officer exhibits.  (N.T. at 290:19–291:11.)  On January 5, 2023, the hearing officer issued her decision denying the parent's claims that the District violated its child find obligations, holding that the IEP was procedurally and substantively inappropriate in certain limited respects but otherwise appropriate, and granting thirty minutes per day of compensatory education for each day that school was in session from March 28, 2021 through May 10, 2021.  (Doc. No. 4-3 at 28.)

---

[47] A.V.'s mother lost custody of A.V. in January 2022, and A.V.'s father obtained full legal and physical custody.  (Doc. No. 16 at ¶ 88.)

### E.     Procedural History

On April 5, 2023, Stephen W., A.V.'s father, filed a complaint in federal court challenging the hearing officer's determinations that the District fulfilled its child find duties and alleging that the District violated the IDEA, Section 504, the ADA, and Pennsylvania law.  (Doc. No. 1.)  The District filed a counterclaim on June 9, 2023 challenging the hearing officer's determination that the IEP was deficient.  (Doc. No. 6.)  The parties agreed that "no further discovery is necessary" and that this matter could be decided on a motion for judgment on the administrative record.  (Joint Rule 26(f) Report, received July 5, 2023, at 4.)  On October 6, 2023, the parties filed cross-motions for judgment on the administrative record.  (Doc. Nos. 12, 13.)  The Court held oral argument on the motions on May 29, 2024 (Doc. No. 20), and following the Third Circuit's precedential opinions in *Le Pape v. Lower Merion School District*, 103 F.4th 966, 983 (3d Cir. 2024) and *B.S.M. v. Upper Darby School District*, 103 F.4th 956 (3d Cir. 2024), ordered supplemental briefing on the motions (Doc. No. 23), which the parties filed in June and July 2024 (Doc. Nos. 24–27).

## II.     LEGAL STANDARD

### A.     *Statutory Framework*

#### 1.     IDEA

The IDEA offers federal funds to states to assist in educating children with special needs. *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017).  In exchange, the IDEA "places two significant responsibilities on school districts with respect to children with disabilities:  the child-find obligation and the duty to provide a free appropriate public education, commonly referred to as a 'FAPE,' to children with disabilities."  *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 137 (3d Cir. 2022) (citing *D.K. v. Abington Sch. Dist.*,

696 F.3d 233, 244 (3d Cir. 2012)).  A FAPE includes "special education" and "related services."  *Endrew F.*, 580 U.S. at 390; *see also* 20 U.S.C. § 1401(9).  "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability," and "related services" are the services "required to assist a child . . . to benefit from" their special education.  20 U.S.C. § 1412(a)(1).

The child find obligation requires schools "to identify and evaluate all students who are reasonably suspected of having a disability."  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012) (citing *P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009)); 20 U.S.C. § 1412(a)(3) (explaining that states must "identif[y], locate[], and evaluate[]" all children with disabilities who are in need of special education, and must develop "a practical method . . . to determine which children with disabilities are currently receiving needed special education and related services").  Child find extends to children "who are suspected of [having] . . . a disability . . . and in need of special education, even though they are advancing from grade to grade."  *D.K.*, 696 F.3d at 249 (citing 34 C.F.R. § 300.111(c)(1)).  "Once a school district has such a reasonable suspicion that a child has a disability, it has a reasonable time to evaluate 'the specific problems a potentially disabled student is having.'"  *J.M.*, 39 F.4th at 137 (citing *D.K.*, 696 F.3d at 250).

Upon identifying and determining that a child has a disability, the IEP is "the centerpiece of the [IDEA's] education delivery system for disabled children."  *Honig v. Doe*, 484 U.S. 305, 311 (1988).  An IEP is a comprehensive plan prepared by the child's parents, teachers, and school officials detailing how the school will provide the child with the special education and related services that he or she needs.  *Endrew F.*, 580 U.S. at 391 (citing 20 U.S.C. § 1414(d)).

An IEP must propose an "educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id*.

The IDEA sets forth detailed procedures for the preparation of IEPs:

> The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. §§ 1414(d)(1)(A)(i)(I)–(III). The IEP must also describe the "special education and related services . . . that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and when possible, "be involved in and make progress in the general educational curriculum." § 1414(d)(1)(A)(i)(IV).

*Id.*

"The IDEA creates a cause of action against a school district that fails to provide a FAPE to a child who has a disability and needs special education and related services." *J.M.*, 39 F.4th at 138 (citing 20 U.S.C. § 1412(a)(1)(A); *id.* § 1415(f)(3)(E)(i)–(ii), (i)(2)). As the Third Circuit explained in *J.M.*, "a denial-of-FAPE claim may be premised on a child-find violation." *Id.* Such a claim has three elements: (1) "the child must have a disability for which he or she needs special education and related services"; (2) "the school district must breach its child-find duty"; and (3) "the school district's child-find breach must impede the child's right to a FAPE, or, alternatively, the child-find breach must either significantly impede parental participation rights or cause a deprivation of educational benefits." *Id.* (internal citations omitted) (cleaned up).

If a child's parents believe the education their child is receiving from his or her public school violates the IDEA, they must first file an administrative grievance, known as a "due process complaint," against the school district, and then may request an impartial due process hearing to resolve the complaint. *J.M.*, 39 F.4th at 138; 20 U.S.C. § 1415(f)(1)(A). The IDEA's

administrative process is conducted in compliance with state regulations. *Id.* In Pennsylvania, hearings are conducted by "hearing officers," outside contractors hired by the Pennsylvania Secretary of Education. *See* 22 Pa. Code § 14.162(p)(1). As the party seeking relief, Plaintiffs had the burden of persuasion to prove the elements of their claims before the hearing officer. *Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005). After exhausting their administrative remedies, parties dissatisfied with the hearing officer's decision may seek judicial review in federal or state court. 20 U.S.C. § 1415(i)(2)(A); *see also Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014). On appeal to the district court, the burden of persuasion falls on the party challenging the hearing officer's decision. *See Ridley*, 680 F.3d at 270.

### 2.      Section 504

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any program that receives federal funds. 29 U.S.C. § 794(a). This prohibition was extended to public school systems through Section 504. *Id.* § 794(b)(2)(B). To establish a violation of Section 504, a plaintiff must prove that (1) the child was disabled; (2) the child was "otherwise qualified" to participate in school activities; (3) the school received federal financial assistance; and (4) the child was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Ridley*, 680 F.3d at 280 (citing *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999)).

Thus, the IDEA and Section 504 are similar because they both apply to public schools that receive federal funds and both protect persons with disabilities. *J.M.*, 39 F.4th at 146 (citations omitted). However, the IDEA and Section 504 differ because while the Rehabilitation Act defines "disability" as something that substantially limits a major life activity, the IDEA

defines "child with disability" as a child "with intellectual disabilities, hearing impairments . . . , speech or language impairments, visual impairments. . . . , serious emotional disturbance . . . , orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities. *Id.* (citations omitted); 20 U.S.C. § 1401(3); *see also Batchelor*, 759 F.3d at 269 n.4 ("Section 504 defines disability more broadly than the IDEA, and thus, some students covered by Section 504 are not covered under the IDEA."); *B.C. v. Mount Vernon Sch. Dist.*, 836 F.3d 152, 161 (2d Cir. 2016) (explaining that Section 504 seeks to curb discrimination against and protect the rights of disabled individuals to fully participate in major areas of public life, such as education, whereas the IDEA "asks only whether a child 'needs' special education . . . because of a particular impairment")). And, while the IDEA imposes affirmative child-find and FAPE duties on the school district, Section 504 has a "negative prohibition" on discrimination against a disabled person solely by reason of her disability. *J.M.*, 39 F.4th at 146 (citations omitted). Courts have interpreted this prohibition as encompassing child find duties, which exist independently from IDEA child find obligations. *See D.K.*, 696 F.3d at 249 ("School districts have a continuing obligation under the IDEA and § 504—called 'Child Find'—to identify and evaluate all students who are *reasonably suspected* of having a disability under the statutes.") (quotation omitted); *B.S.M. v. Upper Darby Sch. Dist.*, 103 F.4th 956, 965 (3d Cir. 2024) ("The trial court needs to . . . determine whether the School District violated its Child Find obligations under Section 504.").

### 3. Statute of Limitations

The IDEA statute of limitations "requires a parent to request a due process hearing within two years of 'the date the parent . . . knew or should have known about the alleged action that

forms the basis of the complaint.'"[48]  *D.K.*, 696 F.3d at 244 (citing 20 U.S.C. § 1415(f)(3)(C); 34 C.F.R. § 300.511(e)).  "Parents have the same two years to file an administrative complaint alleging a violation of the IDEA or § 504 of the Rehabilitation Act."  *Id.* (citing 20 U.S.C. § 1415(b)(6)(B); 34 C.F.R. § 300.507(a)(2)).  "[T]he IDEA statute of limitations applies to § 504 claims premised on IDEA obligations, such as those invoking Child Find and FAPE duties."  *Id.* (citation omitted).

### B.    Standard of Review

### 1.    IDEA

In IDEA cases, district courts are to conduct a "modified de novo review" of a hearing officer's decision.  *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 269–70 (3d Cir. 2003).  The court exercises plenary review over the hearing officer's legal conclusions, *Colonial Sch. Dist. v. G.K. ex rel. A.K.*, CIVIL ACTION NO. 17-3377, 2018 WL 2010915, at *2 (E.D. Pa. Apr. 30, 2018), *aff'd*, 764 F. App'x 192 (3d Cir. 2019), but must give "due weight" to the hearing officer's factual findings, *S.H.*, 336 F.3d at 269.  "Factual findings from the administrative proceedings are considered to be prima facie correct."[49]  *S.H.*, 336 F.3d at 270.  Although the hearing officer's factual findings are considered prima facie correct, the court may depart from those findings if it explains why and supports its explanation with citations to the administrative record.  *Id.*  The court may not, however, "substitute its own notions of sound educational policy for those of local school authorities."  *Id.* (quoting *MM v. Sch. Dist. of Greenville Cnty.*, 303 F. 3d 523, 530–31 (4th Cir. 2002)).  Additionally, the Court must accept

---

[48] The IDEA statute of limitations also permits parents to request a hearing "in such time as the State law allows;" Pennsylvania has adopted the IDEA statute of limitations regulations in their entirety.  *D.K.*, 696 F.3d at 244 n.4; 20 U.S.C. § 1415(f)(3)(C); 22 Pa. Code § 14.102(a)(2)(xxix)–(xxx).

[49] Still, the Court is permitted to make additional fact findings based on the administrative record and the preponderance of the evidence as a whole.  *See I.K. v. Manheim Twp. Sch. Dist.*, No. 22-1347, 2023 U.S. App. LEXIS 11901, at *7 n.7 (3d Cir. May 15, 2023).

the hearing officer's credibility determinations "unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion." *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (emphasis and quotation omitted).

### 2.      Section 504

The Third Circuit recently clarified that Section 504 claims are subject to a de novo standard of review, as opposed to the IDEA modified de novo standard. *Le Pape v. Lower Merion Sch. Dist.*, 103 F.4th 966, 983 (3d Cir. 2024) ("[T]he Supreme Court has required district courts to apply modified *de novo* review only in their review of IDEA claims, and we decline to extend that review to claims under the ADA and Section 504.") (citation omitted).  The District argues that this Court should continue to apply the modified de novo standard to Plaintiffs' Section 504 claim, asserting that the Third Circuit's *Le Pape* opinion "left unresolved" the standard of review which should apply to non-IDEA claims that *only assert a denial-of-FAPE*. (Doc. No. 24 at 3.)

In *Le Pape*, the plaintiffs appealed the district court's decision granting the defendant's summary judgment motion as to the plaintiffs' intentional discrimination claims under Section 504 and the ADA.  103 F.4th at 970–71.  The Third Circuit reversed and held that applying modified de novo review to those claims curtailed the plaintiffs' rights and remedies under non-IDEA federal law. *Id.* at 983–84.  Although the District correctly notes that Plaintiffs here have not asserted a similar intentional discrimination claim under the ADA or Section 504, the Court nevertheless finds that a de novo standard of review applies based on review of another recent Third Circuit opinion, *B.S.M. v. Upper Darby School District*, 103 F.4th 956 (3d Cir. 2024). *B.S.M.* resembles the case before us, in that the plaintiffs there asserted claims under the IDEA and Section 504 for violation of child find duties and under Section 504 for the denial of FAPE.

*Id.* at 959.  The Third Circuit held that the district court erroneously failed to analyze whether the school district violated it child find obligations under Section 504.  *Id.* at 964–65.  In a footnote, the Court stated, "[t]o the extent the District Court . . . will need to make factual determinations based on the administrative record, . . . 'we decline to extend [modified de novo] review to claims under the ADA and Section 504.'"  *Id.* at 965 n.6 (quoting *Le Pape*, 103 F.4th at 983).  Based on the Third Circuit's statements in *B.S.M.*, the Court finds that the Third Circuit does not intend to extend modified de novo review to Section 504 claims, including Section 504 claims that assert only a denial of FAPE.  Thus, the Court will apply a de novo standard of review to Plaintiffs' claim under Section 504.

## III.    ANALYSIS

As discussed above, the Due Process complaints against the District alleged that the District violated its child find obligation under both the IDEA and Section 504 by failing to identify A.V. by early kindergarten as a student in need of special education.  The complaint also alleged that the District failed to provide a FAPE as required by both statutes because it implemented an inadequate IEP which did not capture A.V.'s present education levels and lacked goals that appropriately addressed all of A.V.'s needs.  (Doc. No. 4-11.)  The hearing officer, following three days of hearings which included testimony from six witnesses, determined:  (1) the District did not violate its child find obligation; (2) the District's IEP was appropriate except for two goals the officer found substantively inappropriate; and (3) A.V. was entitled to limited compensatory education.  (Doc. No. 5-1 at 28.)  Specifically, the hearing officer determined that although the IEP addressed annual goals, two of those goals were puzzling because the expectation for A.V. was no higher than her baseline, and there was no data taken for progress monitoring to assess if her behavior skills for those two goals were improving.

(*Id.* at 26.)  The hearing officer found the testimony of Mrs. Neary and Mrs. Wein to be "quite compelling in light of their experience with early elementary school students, and their familiarity with [A.V.]"  (*Id.* at 16.)  She also found that the school psychologist provided similar, persuasive testimony.  (*Id.*)  Conversely, she found that "testimony of [A.V.'s] mother was rather equivocal as it related to the issues, and lacked persuasive value."[50]  (*Id.*)

Here, Plaintiffs argue that the District failed to timely evaluate A.V. by December 2019 of her kindergarten year based on the evidence regarding A.V.'s behavior, and that the hearing officer erred in "suppl[ying] explanations for [A.V.'s] behavior" when determining whether A.V. had demonstrated behavioral needs suggesting a disability in kindergarten.  (Doc. No. 12-1 at 5–14.)  Plaintiffs also argue that the hearing officer should have conducted an independent Section 504 analysis, but failed to do so.  (*Id.* at 14–17.)  Last, Plaintiffs argue that A.V. is entitled to full days of compensatory education as a result of the District's denial of FAPE.  (*Id.* at 17–21.)  Plaintiffs do not argue in their motion for judgment on the administrative record that the IEP was procedurally or substantively deficient.  (*See generally id.*)

The District, in turn, argues that Plaintiffs' claims prior to the filing of the father's due process complaint on August 26, 2022 are barred by the two-year statute of limitations, that the District's IEP was procedurally and substantively appropriate, and that the hearing officer erred in finding that two of the IEP goals did not expect any growth and lacked progress monitoring.  (Doc. No. 13-2.)

---

[50] The hearing officer continued, "For example, [A.V.'s mother] admitted to lack of recall on many events, repeatedly stating that she asked for an evaluation of [A.V.] for special education services, but then conceding that she did not actually recall mentioning such an evaluation before December 2020 or even understanding what such a request meant before that time.  The mother's testimony was therefore of very limited value."  (Doc. No. 5-1 at 16) (citation omitted).

The Court first addresses whether the hearing officer erred by allegedly substituting its own explanations for A.V.'s behavior at the start of kindergarten.  Next, the Court turns to Plaintiffs' arguments that the District violated its child find obligations under the IDEA and under Section 504.  Last, the Court turns to the District's assertion that the IEP properly provided a FAPE.  Because the Court finds that the District did not violate its child find obligations under the IDEA and under Section 504, the Court need not address whether Plaintiffs' claims are time-barred under the statute of limitations.[51]

### A.    *Explanations for A.V.'s Behavior*

Plaintiffs repeatedly emphasize that the hearing officer erroneously "supplied explanations" for A.V.'s behavior at the start of kindergarten.  (Doc. No. 12-1 at 5, 9.)  There is no basis for this contention.  The record demonstrates that it was A.V.'s teachers and school administrators who believed that A.V.'s behavior at the beginning of kindergarten was the result of her young age, lack of formal preschool experience, and lack of prior structured routine and socialization with her peers.  (N.T. at 76:9–80:12, 80:2–81:1 (Mrs. Neary explaining that many of A.V.'s behaviors were "[t]ypical given her age and her experience coming into school from what [she] knew from [A.V.'s mother][52]" and stating "I have seen [behaviors such as picking her skin, hitting her face, and pulling out hair] with fresh 5-year-old students that are just coming in [to kindergarten] and are not ready"); *id.* at 119:6–18 (Mrs. Neary testifying "[A.V.] has a July birthday and we start school in August.  That's a fresh 5-year-old. . . so we have to give children

---

[51] Although we hold that the District did deny a FAPE to A.V. based on the inadequate IEP, *infra*, the 2-year statute of limitations does not bar these claims because the IEP was implemented on March 28, 2021 (HO-3 at 194:17–22) and A.V.'s father filed his due process claim on August 26, 2022 (Doc. No. 4-11).

[52] Although Mrs. Neary acknowledged in her testimony that A.V.'s mother reported in mid-September 2019 that A.V. had previously attended preschool, she testified that "in my experience and even more now, you can tell who's been in a formal preschool program when they come to you" and stating she had never heard of the Warwick Child Care Center.  (N.T. at 143:11–25.)

the ability to adjust to a new environment.  It's a big change for kids"); *id.* at 240:15–241:22 (school psychologist testifying that it was only fall kindergarten year, and "[A.V.] had a summer birthday so she had just turned 5, and we were seeing some disruptive behaviors in the classroom, but none to lead us to believe that she needed special education services . . . .  It was something that the teacher was very willing and able to intervene and help her make progress"); *id.* at 105:1–16 (Mrs. Neary testifying that she did not suspect A.V. needed special education).) *See Ja.B. v. Wilson Cnty. Bd. of Educ.*, 61 F.4th 494, 503 (6th Cir. 2023) ("It is true that a response-to-intervention framework cannot be used to delay or deny the provision of a full and individual evaluation . . . to a child suspected of having a disability.  But when the section 504 process began, WCS teachers did not suspect that Ja.B.'s behaviors were a result of a disability that required special education services. . . . Additionally, we previously have acknowledged that a school did not violate its child-find responsibilities by first attempting other interventions.") (citations omitted).

### B.    Child Find Obligations under the IDEA

Although Plaintiffs only assert that the District should have conducted an evaluation by December 2019 (Doc. No. 12-1), the Court also reviews the remainder of the record through December 2020—when A.V.'s mother formally asked for an evaluation—to determine whether an alternative date exists in the record when the District should have reasonably suspected that A.V. had a disability and needed special education.

### 1.    August–December 2019: Kindergarten In-Person Education

First, Plaintiffs argue that the District violated its child find duties because it failed to evaluate A.V. by December 2019 of her kindergarten year.  Plaintiffs argue the combination of (1) A.V.'s mother putting the District on notice of behaviors, including being "difficult to teach,"

"stubborn," and "short-sighted" on the survey form, (2) A.V.'s kindergarten teacher, Mrs. Neary, observing many unusual behaviors, such as A.V. hitting, spitting, making random animal noises, licking her body and the floors, picking her skin, hitting her own face, and pulling out her hair and sucking on it, and (3) A.V. failing to demonstrate improvement or meet her goals with the MTSS Tier 3 interventions, should have led the District to evaluate A.V. by December 2019. (Doc. No. 12-1 at 8–10.)  The Court disagrees.

"Neither the IDEA, its implementing regulations, nor the applicable Pennsylvania regulations establish a deadline by which children who are suspected of having a qualifying disability must be identified and evaluated." *Ridley*, 680 F.3d at 271.  School districts need only act within a "reasonable time" to evaluate a student for special education upon notice of a student's behavior indicating a disability, and "need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities, especially at a time when young children are developing at different speeds and acclimating to the school environment." *D.K.*, 696 F.3d at 250.  Additionally, "[r]esponding to a student's needs, even without providing special education services mitigates a Child Find violation." *Mason G. v. W. Wayne Sch. Dist.*, No. 3:22-CV-00004, 2024 U.S. Dist. LEXIS 160079, at *28 (M.D. Pa. Sept. 6, 2024) (citing *D.K.*, 696 F.3d at 252).

The Third Circuit's decision in *D.K.* has a similar fact pattern and illustrates that the preponderance of evidence in the record supports the hearing officer's conclusion that the District did not violate its child find obligations during kindergarten or first grade prior to the issuance of the permission to evaluate in December 2020.  In *D.K.*, the child started in a half-day kindergarten class where he struggled with reading and misbehaved regularly, including failing to follow oral directions and complete classwork in the time allotted, and exhibiting a lack of

self-control.  696 F.3d at 240.  The school psychologist explained that while some kindergarten students have difficulty following directions, it does not necessarily indicate a disorder, and the kindergarten teacher stated that D.K. had exhibited "much growth."  *Id.*  But, given D.K.'s variable marks in reading skills, the school recommended that he repeat kindergarten.  *Id.*

During his second year of kindergarten, D.K. enrolled in a full-day program, but "showed little maturation," and his teacher expressed concern about his behavior, tendency to rush through classwork and difficulty controlling himself, especially when upset, and documented 43 "defiant" and "extremely argumentative" temper tantrums in a 70-day period.  *Id.*  Yet, the school did not conduct an evaluation, and instead implemented behavior plans, including a sticker chart and a system using popsicle sticks.  *Id.*  By the end of his second kindergarten year, D.K was reportedly doing very well academically and playing well with others, though he still was not making much behavioral progress.  *Id.* at 240–41.  Again, the school did not conduct an evaluation and instead promoted D.K. to first grade where he continued to have behavioral challenges.

D.K.'s first grade teacher explained that she was providing "as many supports as she could," but felt it was still too early to discuss an evaluation.  *Id.* at 241 (alterations accepted).  In January 2006 of first grade, the school placed D.K. in a special social skills group due to his poor social skills, and his parents requested an evaluation that same month.  *Id.*  The school evaluated D.K. in April 2006, finding that D.K. was not eligible for special education because his BASC ratings were not in the "at risk" or "clinically significant" range and he demonstrated proficiency in math and reading; the school promoted D.K. to second grade.[53]  *Id.*  One year later, in July 2007, before D.K. began third grade, D.K.'s parents requested a second evaluation, and

---

[53] The plaintiffs also claimed that the school's April 2006 evaluation was not conducted appropriately, but the Third Circuit rejected this challenge.  *Id.* at 251.

independently sought an evaluation of D.K. in September 2007.  *Id.*  Their independent

evaluation diagnosed D.K. with ADHD.  *Id.* at 242.  Two months later, the school's own second

round of testing also determined that D.K. was eligible for special education services.  *Id.*

The Third Circuit held that the school did not violate its child find duties prior to the

initial evaluation in winter of first grade because "hyperactivity, difficulty following instructions,

and tantrums are not atypical during early primary school years," and the student's report cards

"indicated intermittent progress and even academic success."  *Id.* at 251.  And the Third Circuit

held that the school did not violate its child find obligations after the initial evaluation because

D.K. "exhibited improvement after his April 2006 evaluation" and the school took "proactive

steps" to afford the student with extra assistance to maximize his potential for improvement.  *Id.*

at 252.  The Third Circuit held, "It would be wrong to conclude that the School District failed to

identify D.K. as a challenged student when it offered him substantial accommodations, special

instructions, additional time to complete assignments, and one-on-one and specialist attention en

route to eventually finding a disability."  *Id.*

Given the holding in *D.K.*, courts have held that "'addressing [a student's] needs and

providing appropriate instruction and interventions before rushing to special education

identification' satisfie[s] Child Find obligations."  *Mason*, 2024 U.S. Dist. LEXIS 160079, at

*24–29 (quoting *Ridley*, 680 F.3d at 272).  *See also Ridley*, 680 F.3d at 271 (holding that the

school did not violate its child find obligations where the student struggled academically with

several failing grades and the teacher declined the parents' request to hold a meeting regarding

the grades because the teacher testified that first grade was the first time that the children would

ever be in a test taking situation, and that it was reasonable to assess the student's progress for

the first term of first grade before recommending that the student be re-evaluated for a learning

disability); *JKG v. Wissahickon Sch. Dist.*, No. 2:19-cv-05276-JMG, 2021 U.S. Dist. LEXIS 55235, at *16–22 (E.D. Pa. Mar. 24, 2021) (holding no child find violation where the student was having trouble staying organized and needed reminders to stay on task and follow directions at the start of school because the school consistently sought to address the student's needs in response to his ongoing diagnostic and behavioral developments); *Mason*, 2024 U.S. Dist. LEXIS 160079, at *24–29 (holding that the school satisfied its child find obligation because the "Title I reading services, a reading intervention specialist, several evaluations over several years, and placement in a co-taught classroom demonstrate that the District provided such appropriate supports before rushing to a disability identification").

Here, similarly, Mrs. Neary testified that some—though not all—of A.V.'s behaviors were typical of a young five-year-old beginning kindergarten; the District took proactive steps to provide extra assistance to maximize A.V.'s potential improvement, including providing MTSS supports and weekly sessions with the mental health specialist; and as discussed in further detail below, A.V.'s behavioral and academic performance *both* improved over the course of the kindergarten year.  (N.T. at 75:25–76:14, 79:23–80:12, 83:4–84:5, 85:2–87:12 (Mrs. Neary testifying that A.V.'s behaviors such as hitting, spitting, disruptive noises, sucking on hair, and licking her own blood were typical of a young kindergartener who had just turned five years old, although others such as fake sneezing and howling, pulling out her own hair, and trying to pick through three layers of skin were not typical); Doc. No. 4-10 at 55–58 (District implementing MTSS Tier 2 supports, including alternative seating options to help A.V. focus, seating A.V. close to an instructional aide during lunchtime, modeling and reinforcing appropriate behavior, using reward incentives, etc.); *id.* at 59 (District implementing Tier 3 supports, which involved a support team consisting of Mrs. Neary, the school psychologist, the school counselor, a reading

specialist, an intervention specialist in math, an instructional coach, and the school principal (*see* N.T. at 102:18–103:20), developing two goals designed to address A.V.'s areas of need, and implementing many interventions, including ignoring A.V. when she made disruptions, redirecting her, using verbal and non-verbal prompts, using a sand clock to count down time remaining in an activity, using a rewards-based behavior plan, and tracking data).)

Plaintiffs attempt to distinguish *D.K.* and argue that D.K. was performing "very well academically," and his needs were not as "extreme" as A.V.'s behaviors. (Doc. No. 18 at 7.) The Court is not persuaded. First, A.V.'s first trimester report card shows academic improvement across virtually every skill tested. (Doc. No. 4-10 at 21–22; *see also* N.T. at 75:10–18 (Mrs. Neary testifying that she did not have any academic concerns with A.V.); *id.* at 126:21–23 (Mrs. Neary testifying, "We all saw a very big positive growth in [A.V.] academically, socially and emotionally").) Second, D.K. exhibited many similar behaviors prior to his first evaluation as A.V. here, including failing to follow directions, rushing through classwork, having difficulty controlling himself, especially when upset, and displaying *forty-three* "defiant" and "extremely argumentative" temper tantrums in a 70-day period. *D.K.*, 696 F.3d at 240–41. And the Court finds that A.V. actually showed some improvement after intervention by the District, *see infra*, unlike D.K., who reportedly made "little behavioral progress" by the end of his *second* kindergarten year and still displayed behavioral challenges in first grade despite his teacher providing "as many supports as she could." *Id.* at 241. Based on the facts presented in *D.K.*, the Court finds the Third Circuit's analysis to be directly applicable to this case and suggests the hearing officer correctly found there was no child find violation.

Plaintiffs also argue that additional facts in the record, which were not present in *D.K.*, show that the District was on notice of A.V.'s need for an evaluation and thus, violated its child

find obligation.  Notably, they argue that A.V.'s mother put in A.V.'s kindergarten registration form that she can be "difficult to teach," "stubborn," and "short-sighted," and that A.V. "clearly did not make behavioral progress" because she demonstrated no improvement with the MTSS interventions and failed to meet her MTSS goals.[54]  (Doc. No. 12-1 at 8–10.)  However, the kindergarten registration notes did not provide any formal diagnosis, or even a suggestion of a disability.  *See JKG v. Wissahickon Sch. Dist.*, No. 2:19-cv-05276-JMG, 2021 U.S. Dist. LEXIS 55235, at *16–22 (E.D. Pa. Mar. 24, 2021) (holding no child find violation where the student's parents included comments in his school registration paperwork that the student had been diagnosed with Generalized Anxiety Disorder and had a rule-out[55] for autism, ADD and ADHD, and the student was having trouble staying organized and needed reminders to stay on task and follow directions at the start of school, because the student's only formal medical diagnosis was for Generalized Anxiety Disorder and there was no indication on his school registration that this affected his education).

Additionally, Plaintiffs fail to take into account Mrs. Neary's testimony, which is uncontroverted in the record and supported by extrinsic evidence, specifically emails, that A.V. did demonstrate improvement behaviorally from the time the District implemented MTSS Tier 3 interventions.  (N.T. at 112:2–8 (Mrs. Neary testifying, "In December [2019] she was doing great. . . . The disruptive noises were much less, significantly less, and the attention to task had almost diminished"); *id.* at 119:4–120:4 (Mrs. Neary testifying, "She transitioned very, very

---

[54] Plaintiffs also suggest that A.V.'s MTSS goal of only making one disruptive noise every five minutes "establish[ed] that the School District was on notice of [A.V.]'s extreme behavioral needs" (Doc. No. 18 at 4), but there is no evidence that contradicts Mrs. Neary's credible testimony that this goal was representative of a typical kindergartener's behavior (N.T. at 90:14–91:1).

[55] A "rule-out" "refers to the outstanding need for a health professional to determine through further testing whether an individual suffers from certain health conditions."  *Id.* at *5 n.3.

well.  Considering how she came in and the types of behaviors that you saw in the MTSS report, some of those had become completely nonexistent towards the end of the school year.  She was really, really making progress.  She was making friends."); *id.* at 124:4–11 ("Q: Did [A.V.'s] level of energy differ significantly from her peers in her kindergarten class?  A: Maybe in the first few weeks.  But after we had things going in the right direction, no."); *id.* at 126:17–21 (Mrs. Neary testifying, "I saw a lot of progress with [A.V.] through what we were doing at MTSS, especially given the circumstances that she was through with [her biological father] being back in her life and seeing [the mental health therapist]"); *id*. at 110:12–25 (Mrs. Neary testifying that the frequency of her emails to A.V.'s mother declined over time because the behaviors declined); Doc. No. 4-10 at 153 (Oct. 10, 2019 email from Mrs. Neary to A.V.'s mother stating, "Overall, we have all seen improvements from the start of the year – She certainly has subsided putting her hands/feet, etc on anyone else.  Having her sit in the area directly behind the carpet helps her maintain her personal space . . . . What I'm mostly seeing right now is inappropriate noises (fake sneezing, humming, squealing, hissing, etc) on a pretty consistent basis. . . . so we will definitely be trying to target that specific behavior with this plan. The other thing I'd like to try and correct is following directions the first time given . . . . Having said all of this, we are making strides in the right direction – We have to be mindful that she did just turn 5 and academically she is doing right where I'd hope.  I hope that you know how much I truly enjoy your daughter . . . ."); *id.* at 156 (Nov. 12, 2019 email from Mrs. Neary to A.V.'s mother stating, "Overall she is making great progress, we are still working on her goals and tracking data for disruptive noises and transitioning.  As an update, I use a 3 min timer with [A.V.] that is working really well to help her transition from a preferred task."); *id.* at 167 (Jan. 13, 2020 email from Mrs. Neary to A.V.'s mother stating, "[A.V.] did have a little bit of an off

day in general.  She was extremely excited this entire morning and had a pretty hard time

calming herself down and following directions.  *It's been a long time since I've seen her making*

*random animal noises and non-compliance when given a direction (to sit down) but she did both*

*today*") (emphasis added).)[56]

  Because Plaintiffs fail to point to extrinsic evidence that refutes Mrs. Neary's credible[57]

testimony, and child find obligations can be satisfied by proactively responding to a student's

needs without rushing to judgment, the Court cannot find that the District violated its IDEA child

find obligations before March 2020.  *Compare Ja.B.*, 61 F.4th at 501–04 (holding no child find

violation where student's parents frequently communicated with school regarding his home

behavior and seeking intervention, where student's behavior at school resulted in repeated

suspensions and hospital visits for mental health, and where student was arrested following a

---

[56] Contrary to Plaintiffs' assertion that A.V. failed to meet her MTSS goals, the record shows that as to A.V.'s goal of reducing disruptive noises, she achieved her goal of one disruptive noise every five minutes on 9 of 16 days observed in the morning session, and achieved her goal on all 13 days observed in the afternoon session.  (Doc. No. 4-10 at 59.)  Additionally, as to her goal of reducing the number of prompts needed to transition from a preferred activity, A.V. met her goal in the morning session on 8 of 14 days observed, and met her goal on 5 of 13 days observed in the afternoon session.  (*Id.*)  Regardless, the Third Circuit's analysis in *D.K.* further shows that the District did not need to rush to evaluate A.V. in December 2019 even if she had failed to consistently meet her Tier 3 MTSS goals.  697 F.3d at 251–52.

[57] Plaintiffs urge the Court to disregard Mrs. Neary's testimony because in her nine years as a kindergarten teacher, teaching about 24-25 students per year, Mrs. Neary testified that she has only referred one student for special education services.  (Doc. No. 12-1 at 13; N.T. at 74:9–13, 91:2–20.)  Plaintiffs point to data from the Pennsylvania Department of Education suggesting that this is statistically anomalous and ask that the Court to disregard her testimony.  (Doc. No. 12-1 at 13.)  However, the parties in this matter specifically agreed to rest on the administrative record in moving for judgment on the administrative record.  (Joint Rule 26(f) Report, received July 5, 2023 at 4.)  Additionally, as the District argues, the data cited by Plaintiffs only suggests that 17.8% of all students in Pennsylvania are enrolled in special education, and does not include any further data analysis as to kindergarten students in particular.  See *Special Education in Pennsylvania 2019-2020*, Pennsylvania State Data Center, April. 2021, https://penndata.hbg.psu.edu/Portals/66/documents/SpecialEducationSummary/2019-2020_Special_Education_Data_Book_4-12-2021.pdf.  Thus, since the interpretation of this data is disputed and since the parties agreed to rest on the administrative record, the Court will not consider it.  *See Delgadillo v. Kijakazi*, No. 20-56211, 2022 U.S. App. LEXIS 2866, at *2 (9th Cir. Feb. 1, 2022) ("A party cannot circumvent the rules governing administrative record supplementation by asking for judicial notice.").

series of behavioral escalations at school, because student's records from previous school reflected that he was meeting academic and behavioral expectations, student's teachers did not suspect that the behaviors were the result of a disability requiring special education, and the school's teaching team discussed possible supports and began the § 504 process which provided for additional interventions.  The court emphasized that a school does not violate its child find responsibilities "by first attempting other interventions for a student instead of immediately referring for an evaluation"), *with Spring Branch Indep. Sch. Dist. v. O.W.*, 961 F.3d 781, 793–95 (5th Cir. 2020) (holding that it was not reasonable to try intermediate measures to determine whether special education testing was appropriate because the student was not exhibiting behaviors "typical" of boys his age—the student's behavior was severe, including drawing violent pictures depicting murder, using "incredibly vulgar language" and making lewd gestures in class, disrupting class by yelling obscenities, and hurling racial slurs at the principal, teacher and students—and because the district had already previously attempted to provide positive and negative reinforcements, frequent redirections and consequences for the student's behavior, but with no effect).

### 2. December 2019–March 2020: Kindergarten In-Person Education

The Court also rejects any suggestion that the District erred when it failed to evaluate A.V. in March 2020 after her second trimester report card showed that she still had seven "Needs Improvement" notations for learning related behaviors, as opposed to eight such notations in the first trimester.  (Doc. No. 4-10 at 22.)

On this issue, the hearing officer found Mrs. Neary credible when she explained that the grade notations for the report card were not specific enough to show the nuanced improvements that she believed A.V. demonstrated, and Plaintiffs have failed to provide extrinsic, non-

testimonial evidence to refute Mrs. Neary's credible testimony.  (N.T. at 98:6–18, 125:14–126:6, 141:13–142:8); *Shore*, 381 F.3d at 199.  And, although the Court is troubled that the MTSS data from October 2019 through March 2020 is absent from the record, the Court cannot adversely infer from the absence of MTSS data that A.V.'s behavior worsened after October 2019, especially in light of the emails which suggest improvement consistent with Mrs. Neary's testimony, discussed *supra*.

The Court recognizes that despite the improvement noted for A.V., there was a shift during December 2019 and early 2020 when A.V. started taking the belongings of others and hitting and shoving other students.  (Doc. No. 4-10 at 156, 157, 159–61, 163–66, 168, 173.)  But it cannot be overlooked that the District continued to proactively respond and quickly added the support of the mental health therapist for weekly sessions to help A.V. process daily emotions and access coping strategies.  (*Id.* at 101.)  *See D.K.*, 697 F.3d at 251–52.

Last, the Court observes that there is no evidence in the record that A.V.'s academic performance was impacted by her behaviors, as Mrs. Neary testified that she did not have any concerns regarding A.V.'s academic performance and her report card demonstrates progress in every single academic skill from the first to the second trimester.  (Doc. No. 4-10 at 21–22; N.T. at 75:10–18, 126:21–23 (Mrs. Neary testifying, "We all saw a very big positive growth in [A.V.] academically, socially and emotionally").)  *See Northfield City Bd. of Educ. v. K.S.*, No. 19-9582 (RBK/KMW), 2020 U.S. Dist. LEXIS 97184, at *25 (D.N.J. June 3, 2020) ("In cases involving mental health disabilities, courts typically only find violations where the school district ignored a marked increase in concerning behavior by the student that was accompanied by a marked decline in academic performance."); *JKG*, 2021 U.S. Dist. LEXIS 55235, at *16–22 (holding that the school did not violate its child find obligations where the student's teacher was not

concerned that his behaviors were impacting his classroom performance); *see also B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d at 161 ("The IDEA asks only whether a child 'needs' special education and related services of a particular impairment . . . . [and] thus advances the ameliorative statutory aim of 'improving educational results for children with disabilities.'") (citations and alterations omitted).

Thus, the Court cannot find that the District violated its IDEA child find obligations before March 2020.

### 3.     March–October 2020: Covid-19 Remote Education

The District was still required to provide a FAPE to students with disabilities even during the pandemic. *Abigail P. v. Old Forge Sch. Dist.*, 3:21-CV-02033, 2023 U.S. Dist. LEXIS 42949, at \*27 (M.D. Pa. Mar. 14, 2023), *aff'd* 105 F.4th 57 (3d Cir. 2024).

#### a.     *March–May 2020 (Kindergarten)*

The record is sparse as to A.V.'s behavior and academic performance in kindergarten after the school shut down in response to the pandemic.  For the period from March–May 2020, the record merely indicates that A.V. did not receive any MTSS interventions during the period because they were classroom-based interventions, and that A.V. did not attend Zoom sessions and failed to complete most assignments.  (*See* Doc. No. 4-10 at 175; N.T. at 121:7–10, 123:8–22.)  Yet, the District did not require attendance for kindergarteners and agreed all students would move on to first grade.  (N.T. at 123:11–18, 243:20–244:8; Doc. No. 4-10 at 175 (May 27, 2020 email from A.V.'s mother to Mrs. Neary asking if A.V. would be held back if she didn't catch up on her assignments and Mrs. Neary responding, "The district is not retaining students due to this closure, . . . they are prepared to assess students at the start of the new year and support in accordance with needs").)  Without the benefit of any evidence in the record, and

given that Plaintiffs bear the burden of challenging the hearing officer's conclusions, *Ridley*, 680 F.3d at 270, the Court cannot determine that the District should have been aware of some particular behavior during this period that indicated a disability necessitating a special education.

>                   b.     *August–October 2020 (First Grade)*

In first grade, Mrs. Wein made a number of observations during remote education, which was in place from August through October 2020, such as that A.V. was frequently missing instruction, not completing assignments, calling out, putting things in front of the computer camera, turning the camera off when she didn't want to finish work or a conversation, having meltdowns, making noises, and getting very upset when things did not turn out as intended. (Doc. No. 4-10 at 186–87, 193–94, 198–99 (six emails from Mrs. Wein to A.V.'s mother informing her that A.V. was missing class and not completing assignments); *id.* at 61–62.) However, she also testified to a number of observations about A.V.'s home life including that A.V. lacked adult supervision and had a strained relationship with her mother and biological father.[58]  (N.T. at 189:25–190:15 (Mrs. Wein testifying, "I was very concerned that [A.V.] did not have adult supervision at home and she was not attending Zoom and that really concerned me.  She was turning off her camera or not coming back on time and not completing activities or assignments, which is very typical of a 6-year-old who does not have any support."); *id.* at

---

[58] (*See* N.T. at 194:20–195:15 (Mrs. Wein testifying, "[A.V.] sometimes would get upset and said that mom . . . – there was one time where she had to clean the grease off the stove or fold clothes, and her excuse was she could not be on the Zoom because her mother told her if she didn't finish this before she got home, she was in big trouble.  Q: And how was that communicated to you?  A: By [A.V.].  But then mom has come in the house when they were on Zoom and I've heard her yell at her and curse, which [A.V.] became very upset.  So it was hard for her to focus on schoolwork when she was more worried about what she had to do before mom came home. . . . Q: Any idea how often you observed that? A: Several times."); *id.* at 212:15–22 ("Q: Did [A.V.'s father ever express any concerns to you?  A: No. But one day on the Zoom, [A.V.] came on and [her father] was present at [A.V.'s] home, and he told me that he was going to support [A.V.], but that was only the one day and I hadn't seen him after that."); *see also id.* at 107:15–17 (Mrs. Neary testifying, "She was always very nervous about communication with mom and what would happen as her punishment at home.").)

157:13–20, 252:13–17 (school psychologist testifying that A.V. did not have adult supervision when she observed A.V.'s remote learning for purposes of the ER); HO-2 at 67:16–25 (A.V.'s mother testifying that she "couldn't sit with her like most parents could, but [she] was 25 yards away"); Doc. No. 4-10 at 177–79 (Oct. 1, 2020 email from Mrs. Wein to A.V.'s mother stating, "[A.V.] has been missing a lot of the direction instruction of our lessons. . . . This has been happening a lot lately."  "When we call on [A.V.], she is usually not there.  She comes in and out but usually misses the teacher instruction. . . . [She] was extremely upset during math today . . . . I met with her, tried to calm her down with belly breathing . . . . She kept repeating, I am in so much trouble. . . . She was hitting her face with her fist.  When I left her, she was going to her special and seem[ed] a bit calmer.").)  Although the record shows District representatives communicated with A.V.'s mother multiple times in October and November 2020 about assisting her in applying for childcare scholarships, there is no suggestion in the record that A.V.'s mother followed up with these applications.  (Doc. No. 4-10 at 27–28.)

Given the uncontroverted testimony from the school psychologist that 6-year-olds require adult supervision in order to meaningfully participate in remote education (N.T. at 252:13–22), and the evidence that A.V. was left to attempt to participate in virtual education without such support and at the same time complete a number of household chores in order to avoid punishment, the Court finds that the District could have appropriately attributed A.V.'s difficulty with remote education to her lack of parental supervision and home life, rather than a disability requiring special education.

### 4.      October–December 2020: First Grade In-Person Education

By October 22, 2020, the District transitioned to hybrid learning and A.V. began attending school in person two days a week.  (Doc. No. 16 at ¶¶ 29–31.)  At that time, the

51

District resumed MTSS interventions for students whose interventions had been truncated by the pandemic.  (*Id.* at ¶ 34; N.T. at 269:12–17 (school psychologist testifying that "[f]or all students who were mid-[MTSS] process when we went out due to building closures, we circled back with them once we had beginning-of-the-year data the following school year to determine what supports they needed to move forward").)  On November 30, 2020, A.V.'s mother submitted A.V.'s formal ADHD diagnosis to the District and requested an evaluation on December 2, 2020.  (Doc. No. 16 at ¶¶ 34, 35.)  The District quickly responded with a request for permission to evaluate.  (*Id.* at ¶ 35.)  A.V. had only had 12 in-person school days with Mrs. Wein before A.V.'s mother submitted the formal diagnosis and evaluation request.[59]  (*See* 2020–21 Academic Calendar.)  The Court finds that this short period of time, after A.V. had not been in-person for nearly eight months, was not long enough for the District to meaningfully implement renewed interventions to determine if A.V. might make the same improvements that Mrs. Neary observed in kindergarten, and thus the District did not violate its IDEA child find obligation.[60]  If the facts had been different, such as if A.V.'s mother did not submit a formal diagnosis for several more months, or if the District refused to evaluate A.V. when requested, the Court may have found differently, but based on these facts the Court cannot find that the District violated its IDEA child find obligation.

---

[59] Similarly, it wasn't until late November 2020 when A.V.'s mother had a parent teacher conference with Mrs. Wein and the principal expressing her concerns regarding A.V.'s behavior and progress with remote learning.  (HO-2 at 64:17–23.)

[60] Although A.V. was not testing academically where Mrs. Wein would have expected in first grade pre-COVID, both Mrs. Wein and the school psychologist testified that none of the students were performing academically where they would have expected due to the COVID-19 disruption.  (N.T. at 213:11–24; 248:3–17.)  Furthermore, given that A.V. frequently failed to complete assignments and attend virtual instruction (Doc. No. 4-10 at 186–87, 193–94, 198–99), Mrs. Wein testified that she did not have academic concerns with A.V. during this time aside from her attendance (N.T. at 156:20–157:2).  Finally, Mrs. Wein also testified that A.V. was demonstrating progress in her academic skills.  (*Id.* at 182:2–4.)

\*   \*   \*

For the foregoing reasons, the Court finds based on a thorough review of the record that the District did not violate its child find obligations under the IDEA.  The school consistently sought to respond to A.V.'s ongoing behavioral developments.  The District has a reasonable time to evaluate a student for special education upon notice of a student's behavior indicating a disability and need not rush to judgment in conducting such evaluations at a time when young children are developing at different speeds.  *D.K.*, 696 F.3d at 250.

### C.    *Child Find Obligation under Section 504*

Next, Plaintiffs also contend that the hearing officer erred in not conducting a separate Section 504 analysis, arguing that it is possible for a child to be eligible for special education under Section 504, even if they are not eligible under the IDEA.  (Doc. No. 12-1 at 14–17.)  As noted above, the Third Circuit has cautioned that Section 504 claims should be analyzed separately from IDEA claims, although Plaintiffs' claims under both statutes appear to base child find allegations on the same evidence.  *See B.S.M.*, 103 F.4th at 964–65; *see also A.W. v. Middletown Area Sch. Dist.*, No. 1:13-CV-2379, 2015 U.S. Dist. LEXIS 9774, at \*51–52 (M.D. Pa. Jan. 28, 2015) (separately analyzing Section 504 and IDEA claims because "a qualifying disability under the IDEA does not necessarily imply a qualifying disability under Section 504").  For the reasons stated *supra*, the Court reviews Plaintiffs' Section 504 claim de novo.

The hearing officer did not explicitly analyze Plaintiffs' Section 504 claim, although her decision does reference Section 504 principles and states that her Section 504 and IDEA analyses "shall be addressed together where they overlap."  (Doc. No. 5-1 at 22.)  Because the hearing officer did not analyze the Section 504 claim using the elements of the relevant statute, the Court finds that the hearing officer erred as a matter of law.  *See B.S.M.*, 103 F.4th at 964–65.

53

However, upon an independent and thorough Section 504 analysis, the Court holds that based on the preponderance of the evidence in the administrative record, the District did not violate its child find duty under Section 504.

Reiterating the elements of Section 504, a plaintiff must prove that (1) the child was disabled; (2) the child was "otherwise qualified" to participate in school activities; (3) the school received federal financial assistance; and (4) the child was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Ridley*, 680 F.3d at 280 (citation omitted). A "disability" within the meaning of Section 504 means something that substantially limits a major life activity. 34 C.F.R. § 104.3(j)(1). Here, there is no dispute that A.V.'s ADHD is a qualifying disability under Section 504, that she was otherwise qualified to participate in school activities, and that the school received federal financial assistance.

In addition to the elements discussed above, Plaintiffs must also prove that the District knew or should reasonably have been expected to know of the disability, under Section 504's child find requirement. *Ridgewood*, 172 F.3d at 253. The Third Circuit has stated there are "few differences, if any, between IDEA's affirmative [child find] duty and § 504's negative prohibition." *Id.* Here, based on a de novo review, which often overlaps with the above IDEA child find analysis, *supra*, the Court holds the District did not violate its Section 504 child find obligation.

### 1.    August 2019–May 2020: Kindergarten

In kindergarten, the District need not have rushed to judgment, "especially at a time when young children are developing at different speeds and acclimating to the school environment," *D.K.*, 696 F.3d at 250, since many of A.V.'s behaviors were typical for young kindergarteners.[61]

---

[61] Even under the de novo review standard, the Court agrees with the hearing officer's credibility findings as to A.V.'s teachers, the school psychologist, and A.V.'s mother. (*See* Doc. No. 5-1 at 16.) In particular,

(*See* N.T. at 76:9–80:12, 80:2–81:1 (Mrs. Neary explaining that many of A.V.'s behavior were "[t]ypical given her age and her experience coming into school from what [she] knew from [A.V.'s mother]" and stating "I have seen [behaviors such as picking her skin, hitting her face, and pulling out hair] with fresh 5-year-old students that are just coming in [to kindergarten] and are not ready"); *id.* at 119:6–18 (Mrs. Neary testifying, "[A.V.] has a July birthday and we start school in August.  That's a fresh 5-year-old. . . so we have to give children the ability to adjust to a new environment.  It's a big change for kids").)  The school was permitted to implement MTSS interventions rather than immediately evaluate A.V. because they did not suspect that her behaviors were a result of a disability.  *Ja.B.*, 61 F.4th at 503; (N.T. at 240:15–241:22 (school psychologist testifying that it was only fall kindergarten year, and "[A.V.] had a summer birthday so she had just turned 5, and we were seeing some disruptive behaviors in the classroom, but none to lead us to believe that she needed special education services.").)

And A.V. was improving with the help of those proactively implemented MTSS interventions.  The District's MTSS program included many interventions, such as providing alternative seating options to help A.V. focus, seating A.V. close to an instructional aide during lunchtime, modeling and reinforcing appropriate behavior, using reward incentives, using a sand clock to count down time remaining in an activity, coordinating a multi-person team to monitor A.V.'s progress, establishing goals to help target areas of need, and tracking behavior-related data.[62]  (Doc. No. 4-10 at 55–59.)  The Court is particularly struck by Mrs. Neary's multiple

---

after review of the record, the Court also finds that the mother's testimony lacked persuasive value due to the evasive and combative nature of her testimony on cross-examination by the District.  (*See generally* HO-2.)

[62] The Court acknowledges that the record is missing MTSS data from late October 2019 through March 2020.  This is problematic because the District has represented that it was collecting data all along (N.T. at 268:6–14), yet has nothing to show for it.  Still, because the data is simply absent from the record, and there is no evidence in the record to contradict Mrs. Neary's testimony that A.V. was improving

emails to A.V.'s mother, which depict a contemporaneous story of improvement in A.V.'s behavior.[63]  (*See* Doc. No. 4-10 at 153 (Oct. 10, 2019 email from Mrs. Neary to A.V.'s mother stating, "Overall, we have all seen improvements from the start of the year – She certainly has subsided putting her hands/feet, etc on anyone else.  Having her sit in the area directly behind the carpet helps her maintain her personal space . . . . What I'm mostly seeing right now is inappropriate noises (fake sneezing, humming, squealing, hissing, etc) on a pretty consistent basis. . . . so we will definitely be trying to target that specific behavior with this plan.  The other thing I'd like to try and correct is following directions the first time given . . . . Having said all of this, we are making strides in the right direction – We have to be mindful that she did just turn 5 and academically she is doing right where I'd hope.  I hope that you know how much I truly enjoy your daughter . . . ."); *id.* at 156 (Nov. 12, 2019 email from Mrs. Neary to A.V.'s mother stating, "Overall she is making great progress, we are still working on her goals and tracking data for disruptive noises and transitioning.  As an update, I use a 3 min timer with [A.V.] that is working really well to help her transition from a preferred task."); *id.* at 167 (Jan. 13, 2020 email from Mrs. Neary to A.V.'s mother stating, "[A.V.] did have a little bit of an off day in general.  She was extremely excited this entire morning and had a pretty hard time calming herself down and following directions.  *It's been a long time since I've seen her making random animal noises*

---

throughout the year, which in fact is supported by extrinsic emails, the Court accepts these representations.

[63] A.V.'s report card only showed marginal improvement in learning related behaviors from the first to second trimester.  (Doc. No. 4-10 at 21–22.)  However, Mrs. Neary testified that these marks weren't representative of A.V.'s overall improvement because the three possible report card grades do not provide a broad enough scale to depict everything that's happening in the classroom; "there is still a lot of progress that happens from an NI to an NI, but it is not broad enough to see on paper."  (N.T. at 98:6–18, 125:14–126:6, 141:13–142:8.)  She emphasized the exponential growth she saw in A.V. over the year.  (*Id.* at 126:14–23.)  Since this evidence is also uncontroverted in the record, the Court accepts these representations.

*and non-compliance when given a direction (to sit down)* but she did both today") (emphasis added); *see also* N.T. at 112:2–8 (Mrs. Neary testifying "In December [2019] she was doing great. . . . The disruptive noises were much less, significantly less, and the attention to task had almost diminished"); *id.* at 119:4–120:4 (Mrs. Neary testifying, "She transitioned very, very well.  Considering how she came in and the types of behaviors that you saw in the MTSS report, some of those had become completely nonexistent towards the end of the school year [prior to the COVID-19 pandemic].  She was really, really making progress.  She was making friends.").) *Cf. S.B. v. Goshen Cent. Sch. Dist.*, 20-CV-09167 (PMH), 2022 U.S. Dist. LEXIS 164057, at *47 (S.D.N.Y. Sept. 12, 2022) (granting judgment as a matter of law because "Defendant may have had any number of lawful reasons for its decision to not evaluate K.B. for a Section 504 plan, including its belief that K.B. did not need one given her academic results and teacher reviews, or that *ad hoc interventions such as AIS math tutoring in sixth grade had been effective*.") (emphasis added).

The record from December through March of kindergarten likewise shows far fewer incidents of random disruptions and non-compliance.  It shows a couple one-off incidents of strange behavior, such as A.V. stamping her face and arms (Doc. No. 4-10 at 167), and sticking her tongue in boys' faces (*id.* at 174), but neither A.V.'s teachers nor the hearing officer attribute these incidents to any disability (N.T. at 75:12–18), and the Court agrees.

It is true that there was a shift and A.V. began engaging in a new, problematic behavior of stealing others' belongings in November 2019, and appeared to become more violent with her classmates at the start of 2020.  (*See* Doc. No. 4-10 at 156–57, 159–61, 163–66, 168, 173.) However, Mrs. Neary testified that the stealing behavior wasn't frequent (N.T. at 111:24–112:19), and the record also shows that in response to these developments, the school

implemented additional support for A.V. in the form of weekly mental health counseling to help A.V. develop coping strategies to overcome stressful situations, and to help A.V. process emotions (*see* N.T. at 243:3–19; Doc. No. 4-10 at 49, 161).  Even with A.V.'s continued struggles, Mrs. Neary testified that A.V.'s behaviors were improving and observed A.V. was making friends, absorbing the social and emotional learning in the classroom, and "had more tools in her toolbox to deal with her problems."  (N.T. at 119:24–125:4.)

Given A.V.'s improvements following the MTSS interventions, the Court finds no evidence of a disability limiting a major life activity, and that the school reasonably could not have been expected to know these new behaviors were indications of a disability prior to the COVID-19 pandemic.  Likewise, as stated above, there is minimal evidence in the record regarding A.V.'s behavior during the start of the pandemic in kindergarten aside from A.V.'s lack of attendance and failure to complete assignments (*see* Doc. No. 4-10 at 175; N.T. at 121:7–10; 123:8–22), and the Court cannot discern any particular incidents which could have triggered the District to suspect any disability limiting a major life activity.

### 2.    August–December 2020: First Grade

At the start of first grade, during virtual learning, A.V.'s absence from class instruction is conspicuous.  Mrs. Wein sent multiple emails to A.V.'s mother notifying her that A.V. was frequently absent from classes and submitting incomplete work.  (Doc. No. 4-10 at 186–87, 193–94, 198–99.)  Mrs. Wein observed that A.V. was shutting off her camera when she didn't want to finish an assignment or a conversation, and was calling out, waving things in front of the camera, and crying or hitting herself with her fist.  (*Id.* at 61–62.)  However, the Court also considers the context for this behavior as observed by Mrs. Wein:  A.V. was attempting to access virtual education, *unsupervised*, at the mere age of six, and appeared to have a strained homelife, in that

she would become nervous or upset at her mother's potential reaction if she didn't complete household chores by the time her mother returned home.  (N.T. at 157:13–20, 189:25–190:15, 193:18–24, 194:20–195:19, 252:13–22.)  Against this backdrop, and considering that no one objects to the school psychologist's testimony that children as young as A.V. was at the time *required* adult supervision in order to participate in virtual learning (*id.* at 252:13–22), the Court cannot find that the District should have suspected a disability caused A.V.'s behaviors.

The Court reaches the same conclusion when considering the facts after A.V. began hybrid in-person education two days per week on October 22, 2020.  (Doc. No. 16 at ¶¶ 29, 30.) The District resumed A.V.'s Tier 3 MTSS interventions when she restarted in-person, with the understanding that A.V. had demonstrably improved with the help of MTSS in kindergarten.  (Doc. No. 16 at ¶ 34; N.T. at 269:12–17.)  By this point, A.V. had been without the benefit of any MTSS interventions for the greater part of eight months; and, A.V.'s renewed MTSS interventions were only in place for 12 in person learning days before her mother submitted A.V.'s diagnosis and requested an evaluation shortly thereafter.  (*See* 2019–20, 2020– 21 Academic Calendars; Doc. No. 16 at ¶¶ 34, 35.)  When considering the behaviors A.V. exhibited during virtual learning, combined with the behaviors A.V. exhibited during the 12 in person days before the District received notice of the ADHD diagnosis, the Court cannot find that the District should have known or suspected that A.V. had a disability that substantially limited a major life activity.

\*     \*     \*

For the reasons stated above, the Court finds that the District did not violate its child find obligation to identify A.V. as a student in need of a Section 504 plan based on a disability that substantially impacted a major life activity.

### D.      Adequacy of A.V.'s IEP

Last, the District argues that the hearing officer erred in determining that two of the IEP's goals were inadequate.  (Doc. No. 13-2 at 19–24.)  The first sought for A.V. to increase compliance with directions and classroom routines to 60% of school periods per day over four consecutive school weeks; her baseline for this goal, derived from the FBA, stated that A.V. was non-compliant with 40% of requests.  (Doc. No. 16 at ¶¶ 62, 63.)  The second IEP goal sought for A.V. to demonstrate on-task behavior without disruptions for 60% of her school periods per day over four consecutive school weeks, and A.V.'s baseline was that she was off-task 24% of the 30-second intervals observed.  (*Id.* at ¶¶ 64, 65.)

The hearing officer found that these two goals were "somewhat puzzling in that the expectation was no higher than the baseline, suggesting that they were not at all ambitious. . . . [T]hese two goals did not expect any growth to achieve mastery and are therefore inappropriate." (Doc. No. 5-1 at 26.)  The District argues that neither the hearing officer nor Plaintiffs cite to any evidence that this alleged defect caused a "substantial harm" necessary to award compensatory education, and that the hearing officer's decision is unsupported by the record because "[r]equiring [A.V.] to demonstrate consistent behavior every school day for 4 consecutive school weeks is plainly more demanding than what she can do in a few hours of observation."  (Doc. No. 13-2 at 20–21.)  Conversely, Plaintiffs respond that these goals—which constitute two of the four IEP goals—denied A.V. a FAPE because they "are unambitious and do no confer significant learning and meaningful benefit to [A.V.].[64]"  (Doc. No. 15 at 15.)

---

[64] Plaintiffs also argue in their response to Defendant's motion for judgment on the administrative record that the IEP is deficient because it failed to address other behavioral concerns identified in A.V.'s ER, it only included an "itinerant" level of emotional support, and it did not provide for "direct instruction" from Ms. Gaffney, the special education teacher.  (Doc. No. 15 at 15.)  However, Plaintiffs did not raise such arguments in their opening brief for their motion for judgment on the administrative record, and raise only cursory references to these claims in response to the District's argument regarding the two

Under both the IDEA and Section 504[65], an IEP must be substantively[66] appropriate.  *See*

*D.S.* 602 F.3d at 564–65.  To be substantively adequate, an IEP educational program must "be

appropriately ambitious in light of [the student's] circumstances, just as advancement from grade

to grade is appropriately ambitious for most children in the regular classroom.  The goal may

differ, but every child should have the chance to meet challenging objectives."  *Endrew F.*, 580

U.S. at 402; *see also H.L. v. Tri-Valley Sch. Dist.*, 3:20-CV01125, 2023 U.S. Dist. LEXIS 43169,

at *44 (E.D. Pa. Mar. 14, 2023) (citing *K.D. v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254

(3d Cir. 2018)) ("[An IEP must] be reasonably calculated to enable the child to receive

meaningful educational benefits in light of the student's intellectual potential and individual

---

specific IEP goals.  As such, these arguments were improperly raised, and the Court need not address
them.  *See L.M. v. Downingtown Area Sch. Dist.*, No. 12-CV-5547, 2015 U.S. Dist. LEXIS 49336, at *78
(E.D. Pa. Apr. 15, 2015) (citing *Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir.
1994)) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing
reference to an issue . . . will not suffice to bring that issue before this court.") (internal quotation marks
omitted); *Benjamin A. v. Unionville-Chadds Ford Sch. Dist.*, No. 16-2545, 2017 U.S. Dist. LEXIS
128552, at *55 (E.D. Pa. Aug. 14, 2017) (same); *Luciotti v. Borough of Haddonfield*, No. 1:20-cv-3539,
2023 U.S. Dist. LEXIS 175165, at *9 n.3 (D.N.J. Sept. 29, 2023) (holding that the court would not
address the defendant's arguments relating to three of the plaintiff's claims which were included in the
defendants' response brief to the plaintiff's cross-motion for summary judgment, but not in the
defendants' own motion for summary judgment); *cf. Arrowood Indem. Co. v. Metallo Gasket Co.*, No. 09-
4914 (AET), 2011 U.S. Dist. LEXIS 128780, at *11–12 (D.N.J. Nov. 4, 2011) (holding that the
defendant's affirmative defenses raised in opposition to the plaintiff's motion for summary judgment
were improper because the defendant did not file a cross motion seeking affirmative relief in response to
the plaintiff's motion).

[65] Like the IDEA, Section 504 also has a separate FAPE requirement.  34 C.F.R. § 104.33(a).  "The
obligation to provide a FAPE is substantively the same under Section 504 and the IDEA."  *Upper Darby
Sch. Dist. v. K.W.*, Civil Action Nos. 22-cv-04343, -04347, 2023 U.S. Dist. LEXIS 129803, at *15 (E.D.
Pa. July 27, 2023) (citing *Ridgewood*, 172 F.3d at 253).  "Adopting a valid IDEA IEP is sufficient but not
necessary to satisfy the § 504 FAPE requirements."  *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 912
(9th Cir. 2020) (quotation omitted); *see also* 34 C.F.R. 104.33(b)(2) ("Implementation of an
Individualized Education Program . . . is one means of meeting the [FAPE] standard.").

[66] A challenge to the content of an IEP's goals is a substantive challenge, rather than a procedural one.
*See H.G. ex rel. Davis v. Upper Dublin Sch. Dist.*, No. 13-cv-1976, 2015 U.S. Dist. LEXIS 51009, at *49
(E.D. Pa. Apr. 17, 2015).

abilities.").  "It follows that an IEP 'must address any behavioral issues that prevent a child from

obtaining any meaningful benefit from the education provided.'"  *Id.* at *45 (citation omitted).

Here, the Court agrees with the hearing officer's conclusion and holds that the IEP denied

a FAPE to A.V. because the goals were not appropriately formulated to enable A.V.'s

meaningful educational benefits.  Although the District argues that the IEP team determined that

demonstrating a skill consistently over a period significantly longer than the approximately

three-hour observation period was ambitious enough to enable A.V. to receive meaningful

education benefits (Doc. No. 13-2 at 21), it does not provide any record proposition for this

assertion, and the Court discerns no testimony from school teachers or administrators supporting

this rationalization for the formulation of IEP goals.[67]  The Court understands that A.V.'s

baselines were based on multiple hours of observation during the FBA (Doc. No. 16 at ¶ 67), but

fails to perceive any other purpose of the "baseline" if not to demonstrate A.V.'s *overall*

demeanor—in other words, the purpose of the FBA observation was to report a representative

sample of A.V.'s behaviors and to develop hypotheses and proposals to respond to the behaviors

(Doc. No. 4-9 at 21–24).

The hearing officer correctly noted that "an absence of a way to determine any progress

on [the goals] is more than a minor procedural flaw, and amounts to a substantive denial of

FAPE."  (Doc. No. 5-1 at 27.)  Although the District argues that this conclusion is contrary to the

record because the school could measure progress through direct observation (Doc. No. 13-2 at

23), that supposed measurement of progress is misguided because the analysis would involve

---

[67] Although the District argues that the hearing officer erred in not deferring to the IEP team's
professional judgment (Doc. No. 13-1 at 22), the Court finds that the hearing officer appropriately
determined that the baseline data clearly does not support a finding that the IEP goals were ambitious in
any regard.

inconsistent units of measurement:  only about three hours observation for the initial baseline, but four weeks for the follow-up observation.  For the District's argument to hold water, A.V. should have been observed for a consecutive four-week period for the initial observation.  In other words, comparing A.V.'s performance over a consecutive four-week period versus over a three-hour period is essentially analogous to comparing the proverbial "apples and oranges."  As such, the Court agrees that the District did not have an appropriate way to determine any progress on A.V.'s goals.

The hearing officer correctly noted, "these two specific behaviors [without appropriate goals] almost certainly impacted Student's performance each and every school day to some extent."  (Doc. No. 5-1 at 27.)  Thus, because the District has the burden of challenging the hearing officer's conclusions, *Ridley*, 680 F.3d at 270, and because the relevant IEP goals inherently were not ambitious, the Court finds the IEP could not have been "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities," finds a substantive denial of FAPE, and affirms the hearing officer's conclusion.  *H.L.*, 2023 U.S. Dist. LEXIS 43169, at *44.  *See also Matthew B. v. Pleasant Valley Sch. Dist.*, 3:17-CV-2380, 2019 U.S. Dist. LEXIS 190226, at *33–35 (M.D. Pa. Oct. 31, 2019) (holding the second IEP was substantively inadequate because the second IEP repeated numerous goals from the previous IEP "despite the fact that Matthew had already nearly mastered them" and thus was not "appropriately ambitious" enough to confer meaningful educational benefits).[68]

---

[68] Additionally, although evidence demonstrating the student's improvement can demonstrate the appropriateness of the IEP (*Zachary J. v. Colonial Sch. Dist.*, No. 22-1509, 2024 U.S. App. LEXIS 2187, at *13 (3d Cir. Jan. 31, 2024)), there is no formal data in the record from A.V.'s special education teacher following implementation of A.V.'s IEP (HO-3 at 195:21–196:7), and the informal daily behavior charts show variable behavior in April 2021 (Doc. No. 4-9 at 27–55, 57–64).

### E.      *Compensatory Remedy*

"The relief granted by courts under [the IDEA] is primarily compensatory education."
*Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 717 (3d Cir. 2010).  "Compensatory education is
an appropriate remedy where a school district knows, or should know, that a child's educational
program is not appropriate or that she is receiving only a de minimis benefit and fails to correct
the situation." *Tyler W. v. Upper Perkiomen Sch. Dist.*, 963 F. Supp. 2d 427, 438–39 (E.D. Pa.
Aug. 6, 2013) (citation omitted).  "The amount of compensatory education is calculated by
finding the period of deprivation of special education services and excluding the time reasonably
required for the school district to rectify the problem." *Id.* (citation omitted).

Here, the hearing officer awarded 30 minutes of compensatory education for each day
that the school was in session from March 28, 2021 through May 10, 2021 (A.V.'s last day
before her mother withdrew her from first grade), finding that "[b]ecause these two specific
behaviors [with inappropriate goals] almost certainly impacted Student's performance each and
every school day to some extent, but balancing the flaw with the short time period that Student
attended school after IEP implementation without an opportunity for review and potential
rectification, the award must be modest."  (Doc. No. 5-1 at 27.)  The Court finds no fault with the
hearing officer's logic, and affirms the hearing officer's grant of compensatory education
because the IEP was only deficient as to two of the four goals, *see supra*, and A.V. was
scheduled to join special education programming for 45 minutes per day (Doc. No. 4-10 at 129).
Thus, the Court finds that an award of 30 minutes of compensatory education per day from the
date of the IEP's implementation to the day A.V. was removed from the District is appropriate.

IV.     **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for judgment on the administrative record is denied, and the District's motion is granted to the extent they seek to affirm the hearing officer's conclusions as to child find, but denied as to the hearing officer's IEP conclusions.  The hearing officer's decision is affirmed as to her determination that the District did not violate its child find obligations, that the IEP was deficient in limited respects, and that Plaintiffs are entitled to 30 minutes of limited compensatory education for each day that school was in session from March 28, 2021 through May 21, 2021 to remedy the denial of FAPE.  An appropriate Order follows.